Argued January 10; reversed with directions January 24;
petition for rehearing denied February 28, 1951

## SPENCE, Adm'x, *v.* RASMUSSEN et al.

226 P. (2d) 819

In Banc.

*Paul W. Haviland* and *Hugh B. Collins,* of Medford, argued the cause for appellant. With them on the brief was George W. Neilson, of Medford.

*Edward Branchfield,* of Medford, argued the cause for respondents. With him on the brief were George M. Roberts and G. W. Kellington, of Medford.

TOOZE, J.

This is an action for damages for the death of Alvia Joseph Spence, plaintiff's intestate, resulting from the alleged negligent operation by defendants of a motor truck. The defense of contributory negligence was interposed. The case was tried to a jury, resulting in a verdict and judgment in favor of defendants. Plaintiff appeals.

The defendants George P. Rasmussen, Mary Lee Rasmussen, Allyn A. Monroe, and Dorothy F. Monroe are copartners, engaged in the retail lumber business at Ashland under the assumed name of "Bellview Lumber Company," and are owners of the Dodge motor

truck involved in the accident hereafter described; defendant Ralph Hames was, at the time of the accident, an employee of the lumber company and engaged in the operation of said motor truck for and on behalf of his employers.

The accident occurred January 26, 1948, at about the hour of 6:10 a. m., a short distance west of Gold Hill, in Jackson County, Oregon, on U. S. highway 99, more commonly known as the Pacific highway. The Pacific highway runs generally north and south through the state of Oregon, but at the place of the accident, runs almost directly east and west. The weather was clear and the pavement dry. The sun rose at 7:20 a. m. that day. At the place of the accident the paved portion of the highway is approximately 21 feet in width with the center line clearly marked with a yellow stripe. At the time of the accident, Alvia Joseph Spence was riding a bicycle in a westerly direction (toward Grants Pass from Gold Hill) along said highway. At the same time, defendant Hames was operating said Dodge motor truck in the same direction along said highway, approaching said bicycle from the rear. Both bicycle and motor truck were being operated on the right-hand side of the center line of said highway in the direction they were proceeding.

Alvia Joseph Spence, who was then 58 years of age, was engaged in delivering morning newspapers for his son who was the Oregon Journal carrier in Gold Hill. He was carrying the papers in a white canvas bag hung on the front of the bicycle. He was dressed in a dark Mackinaw and overalls. The bicycle was equipped with an ordinary bicycle front lamp (electric) and with a red reflector on the rear.

A comparatively short distance west of Gold Hill is located the Lazy Acres Motel on the south side of the highway, and at the entrance to the motel there is a sign pointing thereto.

Immediately prior to the accident, one John Spurgeon who was driving a diesel type freight truck and trailer in an easterly direction toward Gold Hill on said highway met and passed Mr. Spence near said motel sign. At that time the defendants' truck was about 200 feet behind the bicycle. The lights on defendants' truck were on dim, and for some little distance before meeting Spence, Spurgeon also had his lights dimmed.

When within 100 feet of the point where he passed Spence, Spurgeon saw the bicycle, his attention being first attracted by the white bag on the front of the vehicle. *Spurgeon testified that the front light on the bicycle was not burning.* He also said that the bicycle was being operated on its own right-hand side of the highway somewhat closer to the center line than to the right-hand edge of the pavement. After passing the bicycle, Spurgeon also met and passed defendants' truck. Spurgeon testified that he was traveling about 40 miles per hour and estimated the speed of defendants' truck as the same.

Within a very short distance after passing the Spurgeon truck and trailer, the defendants' truck struck the bicycle, throwing Spence over the left front fender and to the pavement, instantly killing him, and dragging the bicycle underneath for some little distance. *Defendant Hames did not see Spence or the bicycle until the instant of impact.* As soon after the impact as he could, Hames set the brakes on the

truck, bringing the vehicle to a stop some 200 feet from the point of collision.

Frank Dupray, a state police officer stationed at Medford, in company with Carlos W. Morris, county coroner, reached the scene of the accident that morning at approximately 6:50 a. m. They made an examination of the place of accident and found and measured gouges in the pavement and skid marks in the path followed by the truck from point of impact to where it was stopped. They also found bits of white and red glass on the pavement and in the gouges. The truck was stopped some 104 feet beyond where Spence's body and the bicycle were lying, the body on the left-hand side of the highway, and the bicycle on the right. The evidence showed, however, that immediately after the collision Spence's body was lying across the center line of the highway and later it was carried to the side of the road.

The skid marks extended for a distance of 104 feet. Dupray testified:

"Q. What examination of the scene did you make prior to the point where the skid marks started on the highway, and what did you find?

"A. I found a series of gouges. There was a heavy gouge—about 108 feet from where the skid marks started there was a heavy gouge in the pavement, and from there down to where the skid marks started, about 108 feet, there were a series of gouges where the bicycle had apparently run back under the truck. [Latter part of answer stricken.]

"Q. You can't state what you think caused it. You say you found the gouges. Would you describe those gouges, as to whether you found any foreign materials in them or anything of that sort?

"A. There was maroon paint in some of the gouges.

"Q. Did you measure the distance those gouges were from the center line of the highway?

"A. Yes; I measured the distance. It was about 6 feet 9 inches from the center line to where the gouges were found in the pavement.

"* * *

"Q. Did the gouge marks stop prior to the time the skid marks commenced?

"A. That's about where they stopped, about where the skid marks started.

"Q. Did you see any particles of the vehicles along the highway there?

"A. There were pieces of broken glass, little red particles of glass apparently from a reflector.

"Q. You can't say what you think it was from. State what they were as to size and color.

"A. They were small pieces of broken red glass and white glass.

"Q. Where did you notice those objects?

"A. They were strung along the path where the gouge marks were."

The bicycle is in evidence as an exhibit. From an examination of this exhibit it appears that the lens of the front lamp is completely shattered, and the rear red reflector is practically demolished, though there remain bits of red glass under the outer rim of the reflector holder. The bicycle is painted a maroon color.

There is a dispute between the parties as to the exact position on the pavement of both bicycle and truck at the time and point of collision, but all agree that both bicycle and truck were on the right-hand side of the center line of the highway.

The contentions of plaintiff on this appeal are: (1) that the trial court erred in not permitting an inspection by plaintiff's counsel of certain photographs of

the scene of the accident when the same were being identified by the photographer and in admitting such photographs in evidence; (2) that the trial court erred in denying plaintiff's motion to withdraw from the jury's consideration certain specifications of contributory negligence; and (3) that the trial court erred in giving certain instructions to the jury and in refusing to give others as requested in writing by plaintiff.

■ Inasmuch as the question of the right of plaintiff to inspect the photographs could not arise upon another trial, we do not deem it necessary to discuss the alleged error of the trial court in denying such inspection, except to say that plaintiff was well within her rights in demanding such inspection and her request should have been granted.

In 3 Wigmore, Evidence, 2452, § 1861, it is stated:

"For reasons of policy already considered (ante, § 1847, par. 4), the general rule suffers a virtual exception, well recognized at common law, where a party, having a *document* at the trial, uses it for any evidential purpose. Here it is no hardship to him, and *it is a decided dictate of fairness, to require him to submit it for the opponent's inspection,* even though the former has not yet technically and finally put it in evidence." (Italics ours.)

Webster defines "document" as follows:

"An original or official paper relied upon as the basis, proof, or support of anything else;—in its most extended sense, including any writing, book, *or other instrument conveying information* * * *." (Italics ours.)

Photographs and pictures stand on the same footing as diagrams, maps, plans, etc. *Conn v. Oregon Electric Ry. Co.,* 137 Or. 75, 86, 300 P. 342; 32 C. J. S., Evidence, 611, § 709.

■ A photograph is a "document" within the rule announced by Mr. Wigmore, supra.

■ Furthermore, a photograph is a "writing" within the meaning of § 4-714, O. C. L. A.

Funk & Wagnalls New Standard Dictionary defines a "writing" as follows:

"* * * the act or art of tracing or inscribing on a surface letters or ideographs * * *."

In the same dictionary we find "ideograph" defined as:

"A *picture,* symbol, or sign of an object * * *." (Italics ours.)

In 71 C. J., Writing, 1635, § 3, the scope of the term "writing" is stated thus:

"In its most frequent and most familiar sense the term 'writing' is applied to books, pamphlets, and the literary and scientific productions of authors; in law it is much more frequently used to denote legal instruments, such as deeds, agreements, memoranda, bonds and notes, etc. It may be on paper, wood, stone, or other material; and ordinarily need not be in ink. *The term is not limited to words traced with a pen, or brush, or pencil; but it has been held to include* engraving, etching, lithographing, *motion pictures,* musical compositions, *photographs,* printing." (Italics ours.)

■■ Plaintiff also contends it was error to admit these photographs in evidence. Though perhaps of little weight as substantive evidence as to facts in dispute, considering that two days had elapsed between the time of the accident and the time when they were taken, and though what is depicted might seem to conflict with the physical facts actually existing at

the time and place of accident, nevertheless, we are of the opinion they were admissible. Their evidentiary weight was for the jury.

In their first and second, further and separate answers and defenses, defendants charge, first, that decedent's death was caused solely by his own negligence, and, second, that he was guilty of contributory negligence in certain respects as specifically alleged. The specific acts of negligence charged against decedent are as follows:

"1. He rode his said bicycle in a reckless, heedless, and dangerous manner without any care or caution.

"2. Although it was dark at the time and place of said accident, said bicycle then and there being ridden and operated by plaintiff's decedent, was not equipped with a red reflector on the rear of said bicycle of such size and characteristics and so mounted as to be visible at night from all distances within 300 feet to 50 feet from the rear of said bicycle.

"3. Although it was dark at the time and place of said accident, said bicycle then and there being ridden and operated by plaintiff's decedent was not equipped with a lamp on the front, exhibiting a white light visible from at least 500 feet to the front of said bicycle.

"4. He failed to maintain his bicycle under proper or any control.

"5. He failed to keep a proper or any lookout for vehicles upon said highway and particularly for the Dodge truck then and there being driven by defendant Hames.

"6. He failed to keep to the right-hand edge of said roadway.

"7. He negligently and voluntarily placed himself in a position of peril.

"8. He failed to yield the right of way to passing vehicles.

"9. He failed to use the highest degree, or any degree, of care for his own safety."

Upon conclusion of the testimony and before argument, plaintiff moved the court for an order withdrawing from the consideration of the jury each and every of these several specifications of negligence. The motion was denied and plaintiff excepted. In its instructions to the jury the court submitted to it for consideration all of such specifications.

On this appeal plaintiff contends the court erred in not sustaining her motion. We shall treat the several allegations in the order in which they are pleaded.

■ At the outset, let it be kept in mind that these were charges made by the defendants against decedent, and, therefore, upon the defendants rested the burden of proof as to the same.

A careful examination of the record in this case fails to disclose even a scintilla of evidence to support the charge that decedent rode his bicycle in a reckless, heedless, and dangerous *manner* without any care or caution. He had a lawful right to be on the highway; he was riding his bicycle on the right-hand side of the center line of the road; there is no evidence whatever that he was riding in any unusual way; and in so far as his clothing is concerned, there is no rule of the common law, nor is there any statutory provision, which requires a person before venturing upon the highway to dress in light, rather than dark, clothing.

In the case of *Landis v. Wick,* 154 Or. 199, 217, 57 P. 2d 759, 59 P. 2d 403, the evidence showed that plaintiff was riding on the highway in the dark a

bicycle which was not equipped with either a front lamp or rear red reflector as required by statute. Respecting the status of plaintiff, Mr. Justice Rossman said:

"We do not believe that plaintiff's status was that of a trespasser as he proceeded along the common highway, nor do we believe that by his omission to display the required reflector he had converted himself into a nuisance. He had a right to be where he was. His rights were not less than those of a motorist who is proceeding along the highway in violation of some section of our motor vehicle act, for instance, a motorist who fails to display a tail-light or who illuminates only one of his headlights. * * * A motorist or a bicyclist, who violates some section of our motor vehicle law, does not thereby forfeit his civil rights. His disregard of the law affects his rights against another *only if it contributed to his injury.*" (Italics ours.)

██ As to the allegation respecting a red reflector on the bicycle, there is positive evidence in the record by testimony of witnesses and *by the bicycle itself* to show that the vehicle was equipped with a red reflector on the rear. *There is no evidence that it was not.* Neither is there any evidence that this reflector was not of such size or characteristics and so mounted as to be "visible at night from all distances within 300 feet to 50 feet from the rear of such bicycle," as required by statute. § 115-368, O. C. L. A., as amended. The presumption *is that it was.* This is a disputable presumption and might be overcome by evidence. The burden of proving the alleged violation of the statute rested upon defendants. The only evidence from which it might even remotely be inferred that the bicycle was not so equipped is purely negative and consists of the testimony of defendant Hames that he did not

see Spence or the bicycle until the instant of the impact. Both were within the rays of his dimmed lights before the collision; if not, they should have been if the lights on defendants' truck were as the statute requires. As respects dimmed lights on motor vehicles, § 115-370, O. C. L. A., provides:

"All road lighting beams shall be so aimed and of such intensity as to reveal a person or vehicle on a street or highway at a distance of at least 100 feet ahead of the vehicle."

■ Spurgeon was able to see both decedent and the bicycle with the lights on his truck dimmed for a distance of 100 feet and while traveling on the opposite side of the highway. Spurgeon testified that after passing decedent, he looked in his rear mirror and did not see any *light* on the rear of the bicycle, but he did not say it was not equipped with a red reflector, though on questioning by counsel, his attention was particularly directed to that. The failure of defendant Hames to see decedent and the bicycle before colliding with them does not prove anything except perhaps a lack of proper lookout on his part, which was a jury question. *Both were on the highway in front of him.* A person is chargeable with having seen, and therefore having known, that which he should have seen by keeping a lookout. *McNair v. Berger,* 92 Mont. 441, 15 P. 2d 834.

■ As to negative evidence, we find in 32 C. J. S., Evidence, 1081, § 1037, the following:

"While there have been statements to the effect that negative evidence is entitled to no weight, the more common view is that it is not necessarily destitute of probative value * * *. *Such probative force is,* of course, *reduced to absolute zero*

678

where the fact might reasonably have occurred without being observed by or known to the witness, *or where his negative statement is incredible in the face of the physical facts and circumstances * * *.*" (Italics ours.)

In the case of *Lauderback et al. v. Multnomah County*, 111 Or. 681, 698, 226 P. 697, this court said:

"As a general rule, purely negative testimony is entitled to no weight, for—

" ' "One single positive weighs more,
 You know, than negatives a score."

" 'M. Prior,—Epistle to Fleetwood Shepherd.'
"2 Moore on Facts, Weight of Evidence, p. 1333."

In specification numbered 3, supra, defendants allege a violation by Spence of a statute requiring a bicycle to be equipped with a front lamp.

Section 115-368, O. C. L. A., as amended by ch. 16, Oregon Laws, 1947, provides:

"(b) * * * Every bicycle shall be equipped with a lamp on the front exhibiting a white light *visible from a distance of at least 500 feet to the front of such bicycle,* and with a red reflector on the rear, and of such size or characteristics and so mounted as to be visible at night from all distances within 300 feet to 50 feet *from the rear of such bicycle.* A red light visible from a distance of 500 feet to the rear may be used in addition to the rear reflector." (Italics ours.)

 This provision respecting a front lamp on a bicycle is designed for the benefit of those approaching a bicycle *from the front* and for the protection of the bicyclist from such. It in no way requires a light of such intensity as to render objects visible along the highway in front of the bicycle. The red reflector

is designed to protect the bicyclist from vehicles approaching *from the rear* and to give notice to such vehicles of the presence of the bicycle ahead. The installation of a red *light* on the rear of a bicycle is permissive and not mandatory. The statute contemplates that the red reflector on the rear of the bicycle will show up in the rays of light from the front lamps on the motor vehicle approaching from the rear in time to prevent mishap.

■ The requirements of the statute respecting front lamps on *motor vehicles* have entirely different purposes than the statute respecting bicycle lamps. The front lights on motor vehicles are designed to render visible not only the road ahead and each side thereof, but also persons and objects thereon in the path of the vehicle. They are required to be of such *specific intensity* as to render persons and objects visible on the highway for certain established distances ahead of the vehicle.

In the case of *Flynn et al. v. Kumamoto et al.*, 22 Cal. App. 2d 607, the California Court of Appeals construed a statute of that state respecting front lights on bicycles of almost identical language to that found in the statute of this state above quoted.

In that case it appeared that the plaintiff was riding his bicycle on the highway without a headlight burning, though it was dark, and he was struck from the rear by defendants' sedan automobile and injured. Defendants contended plaintiff was guilty of contributory negligence as a matter of law in riding an unlighted bicycle upon a public highway at night. Respecting this contention, the California court said:

"Inasmuch as the bicycles were equipped with red reflectors, which was not disputed, and were

visible at a distance of 200 feet when directly in front of a motor vehicle as was established by evidence, *it is immaterial in this case that such bicycles were not equipped with a headlight, as the absence of that light did not proximately contribute to the cause of the accident,* the absence of such light not in any manner contributing to the accident. (Greeneich v. Knoll, 73 Cal. App. 1 [238 Pac. 163.])'' (Italics ours.)

There is no evidence in this record that if the front lamp on this bicycle had been burning it could have been better seen by one operating a motor vehicle from the rear, nor is there any evidence from which such inference might reasonably be drawn. As noted, the statutory requirements as to a front light on a bicycle apply to persons approaching from the front, not from the rear.

 Ordinarily, the question of proximate cause must be submitted to the jury for determination, but where, as here, the facts respecting the front lamp on the bicycle are not disputed, we may, and do, hold as a matter of law that the violation of the statute in question by decedent was not a proximate cause nor contributing proximate cause of the accident in question.

 However, we do not agree with plaintiff in her contention that the statute in question requires only that the bicycle be *equipped* with a front lamp. We construe the statute to mean that it must be lighted when on a highway while it is dark. Plaintiff's contention, if sustained, would render the statute absurd. *Brenne v. Hecox,* 129 Or. 210, 277 P. 99.

 The court instructed the jury as follows:

"I instruct you that it is the law of this state that every bicycle shall be equipped with a lamp

on the front, exhibiting a white light visible from a distance of at least 500 feet to the front of such bicycle and that such lamp shall be lighted when the bicycle is on a highway within this state at any time from a half-hour after sunset to a half-hour before sunrise and that it is negligence for one to ride a bicycle upon a highway within this state between such hours without being equipped with such a light or without having such light lighted.''

The plaintiff duly excepted to the giving of this instruction. The instruction as given correctly states the law, but is inapplicable to the facts in the case at bar.

As to the alleged lack of control of the bicycle by Spence, we find that there is no evidence whatever which even hints that he did not have and exercise such control.

■ In 2 Berry, Automobiles (7th ed.) 429, § 2.389, it is stated:

''A car is 'under control' within the meaning of the law if it is moving at such a rate, and the driver has the mechanism and power under such control that it can be brought to a stop with a reasonable degree of celerity.''

See also *Nolen v. Corvallis Auto Transit Co.,* 138 Or. 98, 4 P. 2d 624.

■ Certainly no higher degree of control over his vehicle is required of a bicyclist than that demanded of the operator of a motor vehicle.

■ Defendants next charge decedent with failure to keep a proper or any lookout. By ''lookout'' is meant a careful looking or watching for any object. There is an entire absence of any affirmative showing by evidence that decedent was not maintaining such a

lookout. The presumption, though disputable, is that he was. In their brief defendants assert:

> "Appellant claims error in permitting the jury to consider defendant's charges that decedent failed to keep a lookout * * *. While it is settled law in this state that a bicycle is not a vehicle under the provisions of the motor vehicle act, decedent was not excused from the common law requirement that he exercise such care for his own safety as a reasonably prudent man might exercise. * * * *The truck being driven by Hames had its lights on. It must have made some noise as it approached.* These warnings should have been sufficient to advise Mr. Spence that he was in danger. But even in the absence of such warnings, Mr. Spence owed to himself the duty to protect himself the best way possible. He was not entitled to ride down the middle of a busy highway, during the hours of darkness, wearing dark clothing, and to assume under such conditions that all other traffic would make way for him." (Italics ours.)

 None of the things mentioned in this argument have any bearing upon the fact of whether or not decedent was maintaining a lookout. It may be assumed that he observed the reflection of the lights on the approaching truck and that he heard the noise it made. If so, it was wholly unnecessary for him to turn his head to look back to note what was coming from the rear.· It must be remembered that defendants gave no audible signal by horn or otherwise of the approach of the truck as required by statute if they intended to pass the bicycle. And, in any event, a bicyclist is not required to keep a lookout to the rear unless he is changing his course of travel. He has the right to assume until he knows to the contrary, or until by the exercise of due care on his part he should and would have

known to the contrary, that those coming from the rear will observe him and take such precautions as may be necessary to avoid colliding with him, and to act accordingly. Neither a pedestrian nor a bicyclist is required to take to the ditch every time a motor vehicle approaches from behind. They still have some rights on the highway. The lookout required of them is largely confined to the front and to the right and left at intersections. Decedent was not riding in the middle of the road, but on his own right-hand side.

 Defendants allege decedent was guilty of negligence because he failed to keep to the right-hand edge of said roadway as provided in § 115-327 (a), (b), O. C. L. A. Under the provisions of § 115-305, O. C. L. A., hereafter quoted, a person riding a bicycle is subject to the provisions of the statutes applicable to the driver of a motor vehicle, except those provisions "which by their very nature can have no application" to a bicycle. But subdivision (a) of § 115-327, which requires that a motor vehicle shall be driven upon the right half of the highway, and subdivision (b) of the same section, which provides that in driving upon the right half of a highway the driver of a motor vehicle shall drive as closely as practicable to the right-hand edge or curb of the highway except when overtaking and passing another vehicle, must be read and considered in the light of the construction placed thereon by this court.

In *Weinstein v. Wheeler*, 135 Or. 518, 529, 296 P. 1079, this court said:

> "*Rules of the road similar to ours*, which require the operation of automobiles upon the right-hand side of the roadway, *do not contemplate strict compliance with their provisions except when a car*

*meets and passes another coming from the opposite direction.''* (Italics ours.)

See also *Hartley v. Berg,* 145 Or. 44, 53, 25 P. 2d 932.

As so construed, the statute applies when vehicles are approaching from the front, not from the rear. The primary purpose of the statute is to provide ample clearance between motor vehicles proceeding in opposite directions when passing. Consequently, it follows as a matter of law that decedent was not at the time of the collision violating the provisions of § 115-327, for he was not then meeting or passing another vehicle coming from the opposite direction. The Spurgeon truck had met and passed him.

Next defendants charge decedent with having negligently and voluntarily placed himself in a position of peril. This allegation is wholly indefinite and incomplete. But even assuming it is sufficient as an allegation of negligence, nevertheless, there is no evidence whatever to support it. It is not established by the fact that decedent voluntarily went upon the highway, nor because he was dressed in dark clothing. There is no evidence that he left a place of safety in the face of oncoming danger and put himself in a perilous position. It is quite true that in this day and age when motor vehicles are being operated along our highways at high rates of speed and are altogether too often being driven by "squirrel drivers," the highway is a dangerous place for any pedestrian or bicyclist to be at any time, yet the peril incident thereto does not make one negligent simply because he makes lawful use thereof. We must not forget that there are some obligations resting upon the motorist. Most of the statutory rules of the road are designed for the purpose of reducing this peril

to a minimum, and they contemplate the free use of the highways by all.

We now come to the allegation that decedent "failed to yield the right of way to passing vehicles." At the outset, it might be said that the only "passing" vehicle mentioned in the evidence is the Spurgeon truck and trailer. The defendants' truck was an "overtaking" vehicle.

■ The statutory rules as to "right of way" have no application at all to the situation before the court; neither are there any common law rules that would give rise to a question of "right of way" as between defendants' truck and the bicycle under the facts of this case.

Section 115-305, O. C. L. A., does provide:

"Every person riding a bicycle or an animal upon a roadway and every person driving or leading any animal shall be subject to the provisions of this act applicable to the driver of a vehicle, except those provisions of this act which by their very nature can have no application."

■ Assuming that the term "right of way" may properly be applied to the situation where a motor vehicle is overtaking and passing a bicycle, then the provisions of § 115-330, O. C. L. A., become important. That section provides:

"Except as otherwise provided in § 115-331 the following rules shall govern the overtaking and passing of vehicles:

"(a) The driver of a vehicle overtaking another vehicle proceeding in the same direction *shall pass to the left thereof at a safe distance* and shall not again drive to the right side of the highway until safely clear of such overtaken vehicle.

"(b) The driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle *on suitable and audible signal* and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle.

"(c)　＊　＊　＊

"(d) The driver of an overtaking vehicle when traveling outside of a business or residence district, and under other conditions when necessary to insure safe operation, *shall give audible warning with his horn or other warning device before passing or attempting to pass a vehicle proceeding in the same direction.*" (Italics ours.)

By virtue of § 115-305, O. C. L. A., supra, the applicable provisions of § 115-330 apply to bicycles when being overtaken and passed. *Copenhaver, Adm'x v. Tripp,* 187 Or. 662, 665, 213 P. 2d 450.

██ ██ However, at the time of the accident involved here, defendant Hames was not attempting to pass the bicycle within the meaning of the statute. Furthermore, at the time and place of the accident, the entire left half of the highway was open to defendants' truck for passing. Moreover, there is no evidence, nor is there any claim that defendant Hames gave decedent any audible warning with his horn or other warning device as he approached the bicycle. The giving of this warning is a condition precedent to the statutory right to pass, and even if defendant Hames had been in the act of attempting to pass, by reason of his failure to give the warning, any duties that might otherwise have been imposed upon decedent under the statute were never brought into being. Hence no question of "right of way" ever arose as between defendants' truck and the bicycle.

██ In their last specification of negligence, de-

fendants charge that decedent "failed to use the highest degree, or any degree, of care for his own safety." Under the law the decedent was not required to use the *highest degree* of care in his use of the highway. The degree of care required of him was that required of an ordinarily prudent person in like or similar circumstances; it is ordinary care. Of course, the degree of care one must exercise for his own safety is commensurate with the danger involved; nevertheless, the test always is what an ordinarily prudent person would do or omit to do in like or similar circumstances. By submitting to the jury in this case the charge that decedent was guilty of negligence "if he failed to use the *highest degree* \* \* \* of care for his own safety," the court placed upon him a duty required only of common carriers. (Italics ours.)

■ The motion of plaintiff that all these specifications of negligence be withdrawn from the jury should have been sustained, and it was reversible error for the court to submit them, or any of them, for consideration.

■ The court gave the jury the following instruction:

"I instruct you that the defendants are presumed to be free from negligence and that you cannot presume that the defendants, or any of them, were guilty of negligence in any respect from the mere fact that the accident occurred. The presumption that the defendants are free from negligence must be overcome from the evidence introduced in this case, and the burden of proof is upon the plaintiff to establish by a preponderance of the evidence that the defendants were negligent in one or more of the particulars alleged in the complaint, and that such negligence, if any, was the proximate

cause of the accident, and of the death of plaintiff's decedent."

This is proper statement of the law and is applicable to the issues involved. However, it is to be noted that the court referred only to the *defendants*. No instruction of the same or similar import was given respecting decedent.

By her request numbered III, plaintiff requested the court to give the following instruction to the jury:

"I instruct you that if you find from a preponderance of the evidence that the death of Alvia Joseph Spence was the proximate result of the negligence of defendants, then I instruct you that Alvia Joseph Spence is presumed to be free from contributory negligence and that you cannot presume that Alvia Joseph Spence was guilty of any negligence in any respect from the mere fact that the accident occurred. The burden of proof is upon the defendants to show by a preponderance of the evidence that Alvia Joseph Spence was guilty of negligence, as charged in the answer of defendants."

The court refused to give this instruction, to which refusal plaintiff excepted.

It was a correct statement of the law applicable and should have been given; particularly in view of the fact that the court did instruct to similar effect as respects defendants. The failure to give this requested instruction constituted error.

Judgment is reversed. Remanded for new trial.