Argued November 19, 1958, affirmed October 30, 1959
# NAPIER, ADMT'X *v.* SOUTHERN PACIFIC COMPANY
### 345 P. 2d 400

*E. B. Sahlstrom,* Eugene, argued the cause for appellant. On the brief were Thompson & Sahlstrom, Eugene.

*Joseph Larkin,* Portland, argued the cause for respondent. On the brief were Koerner, Young, McColloch & Dezendorf, John Gordon Gearin, and Wayne Hilliard, all of Portland.

Before PERRY, Chief Justice*, and ROSSMAN, MC-ALLISTER** and O'CONNELL, Justices.

McALLISTER, C. J.

This is an action brought by the administratrix of the estate of Jerry Lue Eanes against Southern Pacific Co. to recover damages for the alleged wrongful death of said decedent, a fifteen year old girl. The court directed a verdict for defendant and plaintiff appeals.

The accident occurred at about three o'clock in the afternoon on July 20, 1953, at a point where defendant's main line track is crossed by a county road

---

* Chief Justice when case argued.
** Chief Justice when case decided.

in the vicinity of Westfir in Lane county. The road runs in an easterly and westerly direction and the railroad in a southerly and northerly direction. Jerry Lue was riding in a pickup truck which was being driven by her aunt, Mable Napier, in an easterly direction. The vehicle was struck at the crossing by defendant's northbound passenger train No. 20. The day was clear and sunny with good visibility. Jerry Lue and her aunt lived about a block and a half from the crossing.

There is a tunnel about 330 feet south of the crossing. The track curves slightly but it is possible to see the crossing from a point about 115 feet inside the tunnel. There were some shrubs and trees growing along the south side of the road west of the crossing but no evidence of any obstruction along the railroad right-of-way between the crossing and the tunnel. A standard railroad cross-arm warning sign stood on the south side of the road just west of the track. An electric wigwag signal equipped with bell and light stood just east of the track also on the south side of the road.

Both Jerry Lue and her aunt died as a result of the accident and the only eye witnesses were the engineer, the fireman and a Mrs. Olson, who lived near the crossing. The fireman was called as a witness by the plaintiff and testified that he was stationed on the left side of the cab; that he saw the pickup when it was about 15 or 20 feet from the crossing approaching slowly from the west; that the vehicle pulled over the first rail and then stopped with the front portion of the vehicle near the center of the track; that the engineer applied the emergency brake about halfway between the tunnel and crossing; that the engine hit the pickup and threw it off the track and that the

train stopped about a train length after the brakes were applied; that with the train traveling at a speed of 40 to 45 miles per hour as it emerged from the tunnel, it was not possible to stop the train before it reached the crossing. The fireman testified that the headlight and the oscillating headlight on the engine were burning and that the engineer blew the whistle as the train cleared the tunnel. He further testified that it was a part of his job to observe signals but that he did not notice the wigwag nor hear the bell of the signal ringing as the train approached the crossing.

The engineer, who was called by the defendant, testified that when he was still a short distance in the tunnel he saw the pickup which was then about three feet from the track moving very slowly—that the vehicle moved right up onto the track and stopped with the front end over the first rail. According to the engineer, the train was traveling from 40 to 45 miles per hour; that about half way between the tunnel and the crossing, he made an emergency application of the brakes—as soon as he realized the pickup was not going to move. The train stopped in about a train length with the last car about 200 feet north of the crossing. The engineer testified that the headlight and the oscillating headlight were both burning, that the bell of the engine was ringing and that he sounded the whistle as the train emerged from the tunnel. He also testified that he rode on the right side of the cab, that the wigwag signal was on the right side of the track and that the signal was operating as the train approached the crossing.

The only other eye witness was a Mrs. Olson who lived on the county road west of the crossing. She died before the trial in the court below but her testi-

mony given at a former trial of this case was read to the jury by the defendant. Mrs. Olson testified that she was on the back porch when the pickup passed her house. She did not see the pickup but heard Jerry Lue and her aunt talking and laughing and recognized Jerry Lue's voice. She was going in the back door when she heard a peculiar blast of the whistle which caused her to run to the front porch from where she could see the crossing. She saw the pickup "on the track when the train hit it just as I come out on the porch." She was asked whether the vehicle was still moving or not and answered, "I don't know whether it was moving or not. It looked like it was standing still when I seen it."

Mrs. Olson testified emphatically that the wigwag signal was working — that she heard it before she reached the front porch and from the porch both saw and heard the signal in operation.

The county road is level for about 25 feet west of the track and then descends toward the west at a grade of about six percent. Blevings Napier, the husband of the driver of the pickup, testified that because of the brush and trees on the south side of the road, "you had to be within about ten feet of the railroad track at the time before you could see the full part of the tunnel." From a scale drawing and photographs introduced by plaintiff, however, it appears that the tunnel could be seen from a point on the road 20 feet or more west of the track.

We deem it unnecessary to review all the evidence and believe the foregoing is a sufficient background against which to consider plaintiff's contention that the court erred in directing a verdict for the defendant. Plaintiff contends that this was an extra-hazardous

crossing requiring the maintenance by defendant of a signaling or warning device and that she produced substantial evidence tending to prove that defendant's wigwag signal was not working at the time of the accident.

■ Whether a particular railroad crossing is extra-hazardous is sometimes a question for the jury and at other times is a question of law for the court. See *Schukart v. Gerousbeck*, 194 Or 320, 241 P2d 882, in which a number of earlier cases are reviewed. We deem it unnecessary to decide whether the crossing involved in this case was extra-hazardous. We are satisfied that under the circumstances of this case the automatic wigwag signal, if operating, provided reasonable warning of the approach of defendant's train. The case then turns on whether plaintiff offered substantial competent evidence tending to prove that the automatic signal was not operating at the time of this accident.

Plaintiff relies on the testimony of several witnesses, including herself, who testified that they did not hear the wigwag signal operating prior to the accident. However, all of these witnesses admitted that they were not paying any particular attention at the time and admitted in effect that the bell could have been ringing without attracting their attention. The plaintiff, Ola Bell Napier, who was the grandmother of Jerry Lue, testified that she was in her home sitting at the sewing machine when the accident occurred. She testified as follows:

"Q And where were you at the time of the accident? Were you in the house?

"A Yes, sitting at the sewing machine sewing.

"Q And did you hear any bells or any signals?

"A No, sir, I never heard any.

"Q And is it possible from where you were at that time and from—on previous occasions could you hear bells from that position?

"A Well, I nearly always did.

"Q And did you know what time the trains ordinarily went through the crossing there?

"A Well, between three—three-thirty and four, somewhere along in there. Sometimes it was a little late.

"Q Somewhere in that area. But it usually went by about the same time, didn't it?

"A Yes, it usually went by the same time.

"Q And I will ask you if on other occasions it is possible from where you are to hear the bell, the crossing bell?

"A Yes, I could hear it.

"Q And did you on this particular occasion hear any crossing bells?

"A No, I didn't.

"* * * * *

"Q Did you hear any whistle of any kind?

"A No, sir.

"Q You are not saying that no whistle was blown—

"A No.

"Q — or no bell rang, just that you didn't hear them if they were, is that right?

"A I wouldn't even say that the train passed, because I didn't hear it pass. But it was there, I seen it standing there."

Blevings Napier testified that he was in the house with his mother, Ola Bell Napier, and did not hear

any bell or any signal prior to the accident. However, on cross-examination, he testified:

"Q Isn't it a fact that a whistle or bell could have been sounded without you hearing it on this day?

"A It could be possible, I suppose.

"Q You weren't paying any particular attention, were you?

"A No, living there you get used to it, I guess.

"Q You get accustomed to the noise?

"A Yes."

Douglas Lloyd Logan was employed at the Westfir store about four or five blocks west of the crossing. He testified that he heard the sound of the collision but did not hear any bells or whistles from the train before he heard the crash. When asked whether he could have heard the bells or whistles if there had been some ringing or blowing, he answered:

"Well, yes, if I had been paying attention I could have heard it. You can hear it from there."

On cross-examination he said:

"Q I notice—I understand from your testimony you weren't paying any attention for the whistles and the bells and that sort of thing?

"A Well——

"Q You weren't listening for them, were you?

"A No."

Miss Johnson, who lived near the crossing, testified that she heard the scream of the whistle and the crash of the accident but did not hear the bells or any signaling devices before the crash. She testified that she had heard the bells and signaling devices from the same position on other occasions but did not say whether she was paying any attention on this occasion.

Mrs. Ricker, who was riding in a vehicle driven by her husband and arrived at the crossing a short time after the accident, testified that she did not hear any whistles or bells prior to the accident but on cross-examination also admitted that she wasn't paying any particular attention and was not listening for whistles.

Michael J. Werner testified that he was at his home about 400 feet from the crossing and did not hear any bells or other signaling devices prior to the accident but also admitted that the bell at the crossing could have been ringing and that he was not paying any more than ordinary attention. On cross-examination he testified that:

"Q Did you say your wife told you the accident had occurred?
"A Yes.

"Q Were you asleep?
"A No, I was in the kitchen.

"Q You weren't paying any particular attention for bells?
"A I don't know what I was doing. All I know I was in the kitchen.

"Q You weren't paying any particular attention at that time?
"A Not any more than ordinary.

"Q Could the bell have been ringing at the crossing and you not have heard it?
"A It would be possible, but not very probable.

"Q It could be ringing and you not heard it?
"A It could have been."

In considering negative testimony, this court has said, in *Lovett v. Gill,* 142 Or 534, 541, 20 P2d 1070:

"The value of negative testimony, like that of all other testimony, is dependent upon the oppor-

tunities which the witness possessed for making observations. *The testimony of a witness who gave negative testimony because he did not observe or was inattentive would amount to nothing.* But if he was in a position where he could observe, and made diligent exercise of his faculties, his testimony that the alleged event did not occur is not negative but is, in fact, positive. Its value is dependent upon his credibility and a comparison of his opportunities for making observations with that of the other witnesses. Wigmore on Evidence (2d Ed.) § 664." (Italics supplied)

■ From the later case of *Fish v. Southern Pacific Co.*, 173 Or 294, 307, 143 P2d 917, 145 P2d 991, we take the following:

"The evidence of the appellant's engineer and of the fireman was positive, to the effect that the bell was rung, while the evidence of plaintiff and his supporting witness was negative, to the effect that they heard no bell. Appellant contends that the positive evidence must prevail, under the rule that, other things being equal, positive evidence is stronger than negative. Under the circumstances, however, we must consider the evidence of the plaintiff, at least, although couched in negative form, as being affirmative in fact. *His attention was centered upon listening for the very thing which he testified that he did not hear.* His hearing was good, and, judged by the imminence of the collision, the train must have been in the immediate vicinity. By the weight of authority, his testimony must be taken as a positive assertion that the bell of the locomotive was not rung. 20 Am. Jur., Evidence, section 1188; Staples v. Spence, (1942) 179 Va. 359, 19 S.E. (2d) 69, 140 A.L.R. 527, and note, 530. Appellant cites Andersen v. Southern Pacific Co., supra, as supporting the contrary view. In the statement of facts in that case, we find the following:

" 'All plaintiff's witnesses testified that they

did not see the train, or hear the ringing of the bell or the sound of the whistle, but no witnesses testified that the headlight on the train was not burning, or that the whistle was not blown or that the bell was not rung before and at the time the train crossed Jefferson Street.'

The court held, in effect, that testimony of the occupants of the automobile, that they did not hear the ringing of the bell or the blowing of the whistle, was not evidence that the bell had not rung, or that the whistle had not blown. The holding, we think, was correct, in view of the fact that the evidence was that none of the occupants of the car either looked or listened. The fact that they failed to listen distinguishes the case from the case at bar." (Italics supplied)

Again, in *Spence, Adm'x, v. Rasmussen et al.,* 190 Or 662, 677, 226 P2d 819, this court quoted with approval from 32 CJS, Evidence 1081, § 1037, the following:

"While there have been statements to the effect that negative evidence is entitled to no weight, the more common view is that it is not necessarily destitute of probative value * * *. *Such probative force is,* of course, *reduced to absolute zero* where the fact might reasonably have occurred without being observed by or known to the witness, or where his negative statement is incredible in the face of the physical facts and circumstances * * *." (Italics supplied)

■ We are fully conscious of the fact that in deciding whether the trial court properly granted a directed verdict we must view the evidence in the light most favorable to the plaintiff and that generally questions of fact must be resolved by the jury. Having reviewed the evidence in that light, we conclude that the evidence offered by the plaintiff was not sufficient

to warrant submitting to the jury the question of whether the automatic signal was operating. A finding that it had not been operating could only be based on speculation.

The judgment of the trial court is affirmed.