Argued December 4, 1978, affirmed January 30, 1979

WAGNER, *Respondent,*

*v.*

KAISER FOUNDATION
HOSPITALS, et al, *Appellants.*

(TC 422-528, SC 25435)

589 P2d 1106

William L. Hallmark, of Jones, Lang, Klein, Wolf & Smith, Portland, argued the cause for appellants. With him on the briefs was Margaret H. Leek Leiberan, of Jones, Lang, Klein, Wolf & Smith, Portland.

Elden M. Rosenthal, Portland, argued the cause for respondent. With him on the brief was Charles Paulson, Portland.

TONGUE, J.

## TONGUE, J.

This is an action for damages for medical malpractice against a hospital and a clinic of doctors. Defendants appeal from a judgment based upon a jury verdict against them in the sum of $750,000.

Plaintiff underwent surgery at defendants' hospital, after which it was discovered that he had suffered permanent brain damage. Plaintiff's theory of the case was that he was administered massive overdoses of narcotics by the defendants' nurse anesthetist; that at the conclusion of the surgery inadequate amounts of reversal drugs were administered; that as a result, unnoticed by defendants, his respiration was substantially depressed, and in turn, the amount of oxygen supplied to his brain was reduced (hypoxia), causing diffuse bilateral brain damage.

Defendants' theory of the case was that plaintiff did not suffer diffuse bilateral brain damage, but instead sustained a rather specific localized amount of brain damage, which was the result of a stroke rather than a period of hypoxia. Defendants contended that this stroke occurred at some point during the surgical procedure, or during the plaintiff's stay in the recovery room, and that it was a result of natural causes.

Defendants contend on this appeal that the trial court erred in three respects: in failing to strike one of the specifications of negligence, as alleged in plaintiff's complaint, to the effect that defendants were negligent "in failing to reasonably monitor the changes in plaintiff's respirations"; in admitting improper rebuttal testimony, and in excluding from the jury anyone who was a member of the "Permanente program or Kaiser."

■ Because of direct conflicts in the testimony it must be kept in mind that after a jury verdict in favor of the plaintiff, this court is required to resolve all conflicts in the testimony in favor of the plaintiff and that plaintiff is entitled to the benefit on this appeal of all

evidence favorable to him and of all inferences which may be reasonably drawn from such evidence. *Cronn v. Fisher,* 245 Or 407, 416, 422 P2d 276 (1966).

■ It is equally fundamental that in determining whether to withdraw an allegation from consideration by the jury it is not the function of the court to weigh conflicting evidence. If an allegation is supported by any competent evidence, including the testimony of a single witness, it is the exclusive function of the jury to decide whether to believe that testimony, despite the fact that all other witnesses may have testified to the contrary. *See Hansen v. Bussman,* 274 Or 757, 763, 549 P2d 1265 (1976), and cases cited therein.

The testimony will thus be summarized in accordance with these established rules.

*The facts.*

The plaintiff, at the time of trial, was 48 years old, married, and the father of two minor children. Prior to his surgery, he had been employed by Catlin Gable School for 13 years, first as a teacher and then as head of the Lower School.

On November 28, 1973, plaintiff underwent surgery at Bess Kaiser Hospital to correct an obstruction in the tear sac on the right side of his eye. According to the hospital chart and the testimony of Dr. Nevill and several nurses, nothing unusual occurred during either the operation or the period of recovery.

When plaintiff was released from the hospital he experienced spacial disorientation. He no longer remembered the location of things in the interior of his house. He had difficulty driving. He also experienced a reduction in his field of vision and a loss of memory.

Plaintiff was examined by several different neurologists who determined that he had suffered permanent brain damage. Plaintiff continued his job at Catlin Gable School for one year after the surgery,

at which time he was fired because the headmaster believed his memory was no longer sufficient. At the time of trial his wage loss exceeded $45,000 and the jury was entitled to find that he had become virtually unemployable.

A neurologist called by plaintiff as an expert witness testified that, in his opinion, "a protracted period of hypoxia" (lack of oxygen to the brain) was the "most probable cause" of plaintiff's "rather diffuse cerebral damage." Other expert witnesses called by plaintiff gave similar testimony.

Plaintiff's expert witnesses also testified that the dose of the narcotics given to plaintiff as an anesthetic by the nurse anesthetist was "greatly excessive" and that the narcotics "tend to slow down the breathing" from 16 to 20 respirations per minute to three or four times per minute and could cause a patient to "forget to breathe." They also testified that the amount of a medication given to plaintiff to counteract that anesthetic and to insure respiration so as to also insure the supply of an adequate amount of blood to the brain was "not nearly enough," was "insufficient in amount" and was not in accordance with "good medical practice." There was also testimony that with the amount of narcotics given "the respiratory depression [of the patient] would last four or five hours"; that a "little bit" of that medication may cause a "little bit of reversal, so that it looks like the patient could breathe, but then thirty minutes later the respiration may have slowed way, way down again because of the tremendous [amount of] narcotic aboard, and the insufficient amount of reversal."

In addition, plaintiff's expert witnesses testified that in this case there "most probably was a period of respiratory depression after conclusion of anesthetic in the recovery room. * * * [I]n the recovery room the patient was breathing on his own and most probably still had a very depressed respiration from the large dose of narcotics"; that plaintiff's respiration rate may

[85]

have dropped to two to three breaths per minute; that hypoxia "probably occurred in the recovery room" and that hypoxia "very probably could have" been sufficient to cause some amount of permanent brain damage.

Under these circumstances, according to testimony offered at trial, it was important while plaintiff was in the recovery room that a nurse closely observe at all times the depth of his respiration and also count the number of respirations per minute to determine whether they were within the normal range. Plaintiff's expert witnesses also testified that it was "not * * * good medical practice" in the community not to chart respirations after such a "massive dose" of narcotics; that "the standard of care [in the community] is * * * to chart the respirations on the recovery room sheet"; that the reason for this requirement is that otherwise it is "easy to just look at a patient, see them breathe, and * * * go about your business"; and that a gradual decrease in the rate and volume of respiration might not be noticed without both observing and "charting" that information.

At that time, however, the "standard policy" of the defendants was to "count and observe" respirations of a patient in the recovery room and to administer oxygen, if needed, but not to "chart" such information unless something unusual was observed, such as an unusually slow respiration rate, which would then be "charted."

According to the recovery room chart for plaintiff, he was admitted to the recovery room at 5:25 p.m. and was discharged from it at 7 p.m. The recovery room nurses apparently had no independent recollection of the plaintiff. During that period, however, his pulse and blood pressure were recorded on the chart at 15-minute intervals. It was noted on the chart that plaintiff was "doing well" and that there were "no apparent complications." The rate and depth of his breathing was not charted, however, despite the fact

that the chart provided a place for the "charting" of respirations.

1. *Failure to strike specification of negligence in failing to reasonably monitor the changes in plaintiff's respirations.*

■ In support of defendants' contention that the trial court erred in not striking from the complaint the specification that defendants were negligent "in failing to reasonably monitor the changes in plaintiff's respirations," defendants say that:

> "* * * In a medical malpractice case, an unsuccessful or bad result is not evidence of negligence on the part of the physician who treated the patient.

> "All the evidence presented at trial which specifically related to Mr. Wagner's treatment at the hospital supported the defendants' position that Mr. Wagner's respirations were properly monitored. Notwithstanding these facts, plaintiff asked the court to permit the jury to infer that defendants did not 'reasonably monitor the changes in plaintiff's respirations.' Plaintiff's evidence on this issue was negative evidence of failure to chart and the testimony that the medications given could cause depressed respirations. Negative evidence is never admissible unless a proper predicate has been proven. No proper predicate was proven in this case.[1]

> "Two of plaintiff's experts (Dr. Holmes and Dr. Anderson) testified that the medication administered could have slowed plaintiff's breathing. The plaintiff did not introduce any evidence which indicated that the plaintiff's breathing actually was slowed. All the evidence which specifically related to Mr. Wagner's treatment at the hospital indicated that Mr. Wagner's respirations were adequately monitored at all times during his stay."

Defendants then cite various cases decided by this and other courts and say that:

---

[1] Among the cases cited in support of this proposition are: *Larson v. Heintz Const. Co. et al,* 219 Or 25, 61, 345 P2d 835 (1959); *Napier v. Southern Pacific Co.,* 218 Or 371, 379-80, 345 P2d 400 (1959); and *Spence, Adm'x v. Rasmussen et al,* 190 Or 662, 677, 226 P2d 819 (1951).

"In all of the above Oregon cases, the negative evidence of witnesses was held to be relevant *only after the parties seeking its admission had proved that if the events had occurred, the witness would have seen or heard it in the normal course of events.*" (Emphasis added)

that:

"All the evidence which specifically relates to Mr. Wagner's treatment at the hospital, *ie.*, the hospital chart, and the testimony of the recovery room nurses, the nurse anesthetist and the surgeon, indicates that Mr. Wagner's respirations were adequately monitored at all times during his stay at Kaiser Hospital. * * *"

and that:

"* * * There was not one scintilla of evidence given at the trial that Mr. Wagner's breathing actually was slowed or that the nurses and doctors on staff at Kaiser Hospital did not adequately monitor Mr. Wagner's breathing. * * *"

Although we do not disagree with the cases cited by defendants, we disagree with the application of these cases to facts such as those presented in this case.

Suppose, by way of analogy, an automobile intersection case in which plaintiff alleges that defendant was negligent, among other things, in that he failed to keep a look-out and ran a red light. Plaintiff testified that he was traveling north and had a "green light" at the intersection and that defendant was traveling west. He offered no direct testimony that the light was red when defendant approached the intersection, but he proved by an expert witness that when the light for northbound traffic is green, the light for westbound traffic is red. Defendant testified that he always looks at stoplights at intersections before entering them, and that he did so at this intersection and that the light was green. Clearly, in such a case, plaintiff has offered sufficient evidence from which a jury could properly find, if it believed plaintiff's testimony, that

[88]

the light was red when defendant entered the intersection, contrary to his testimony, and that defendant was negligent in failing to keep a proper lookout.[2]

Similarly, we believe that there was ample evidence in this case, including the testimony referred to above, from which the jury could have properly found that an excessive dose of narcotics was given to plaintiff by the nurse anesthetist, together with an inadequate dose of medication to counteract and reverse the effects of such drugs; that, as a result, the rate and depth of plaintiff's breathing was slowed while he was in the recovery room to the point that an inadequate supply of oxygen reached the brain, causing diffuse brain damage, and that if defendants' recovery room nurses had properly monitored the rate and depth of plaintiff's breathing they would, "in the normal course of events," have discovered what was then happening in time to give him oxygen so as to prevent the brain damage.[3]

In such a case, as in the hypothetical automobile accident case, the question is not one of "negative" evidence. Indeed, the use of that term confuses, rather than aids, the analysis. Instead, the question is whether affirmative indirect or circumstantial evidence was offered so as to provide a basis from which the jury could properly draw an inference. (*See* ORS 41.080 and 41.320.) In the hypothetical automobile case, the inference which the jury could have properly drawn was that the traffic light was red when defendant approached the intersection and that had he maintained a proper lookout he would have seen the red light, despite his direct testimony to the contrary,

---

[2] *See Fish v. Southern Pacific Co.*, 173 Or 294, 307-08, 143 P2d 917, 145 P2d 991 (1943). *Cf. Casto v. Hansen et al*, 123 Or 20, 24, 261 P 428 (1927).

[3] We have not overlooked defendants' contention that, according to the testimony of one witness, depressed respirations might not be noticed by reasonably trained competent nurses even if they were properly monitoring a patient. The jury was not required to believe that testimony, however, and, in our opinion, there was sufficient testimony, when taken as a whole, from which the jury could properly have found to the contrary.

which the jury was not required to believe. In this case, the inference that the jury could have properly drawn was that plaintiff's respirations were dangerously depressed while in the recovery room and that had defendants' nurses properly monitored his respirations they would have observed that fact, despite their direct testimony to the contrary, which the jury was not required to believe.

It follows, in our opinion, that there was sufficient evidence to support the submission to the jury of the specification that defendants were negligent in failing to "reasonably monitor the changes in plaintiff's respirations" and to support such a finding by the jury.

## 2. *The admission of rebuttal testimony.*

Defendants assign as error the admission of additional expert testimony offered by plaintiff in rebuttal over objection that such testimony was not proper rebuttal testimony.

ORS 17.210 provides that after plaintiff and defendant have both offered evidence,

> "(3) The parties respectively then may introduce rebutting evidence only, unless the court in furtherance of justice permits them to introduce evidence upon the original cause of action, defense or counterclaim."

ORS 17.215 provides that:

> "The order of proof shall be regulated by the sound discretion of the court. Ordinarily, the party beginning the case shall exhaust his evidence before the other begins."

As held by this court in *Rudie Wilhelm W'house v. Royal Ind.*, 271 Or 701, 707, 533 P2d 1368 (1975), quoting with approval from another case:

> " "* * * It is within the sound discretion of the trial court to allow in rebuttal testimony which becomes relevant in rebuttal even though it might have been used in the case-in-chief. * * *" "

Under the facts and circumstances of this case, we do not believe that the trial court abused its discretion in receiving the testimony objected to by defendants. In our view it would serve no useful purpose under the circumstances to discuss the substance of the testimony in question.

3. *The exclusion from the jury of members of the "Permanente program or Kaiser."*

■ Defendants' final contention is that the trial court erred "in preemptorily excluding from the jury anyone who was a member of 'the Permanente program or Kaiser.' "

Defendants recognize that ORS 17.140 provides that:

> "A challenge for implied bias may be taken for any or all of the following causes, and not otherwise:
>
> "* * * * *
>
> "(2) Standing in the relation of * * * physician and patient * * * to the adverse party; * * *.
>
> "* * * * *
>
> "(4) Interest on the part of the juror in the event of the action, or the principal question involved therein."

Defendants also recognize, as stated in their brief, that:

> "In addition to the basis for dismissal of a juror given in ORS, the Oregon cases recognize that it is the duty of the trial court to see that a fair and impartial jury is obtained. The trial court may, therefore, in its discretion, excuse a juror before he is sworn for any reason which seems to the judge sufficient. *State v. Savan*, 148 Or 423, 36 P.2d 594 (1934). The judge has the power to excuse a juror even though no challenge or objection to the juror has been given by a party and for causes not enumerated in the statute. *State v. White*, 48 Or. 416, 87 P. 137 (1906)."

Defendants' principal argument on this appeal, however, is that under the rule as stated by the Supreme Court of the United States in *Taylor v. Louisiana*, 419 US 522, 527, 530-31 (1975), the right to a fair and impartial jury requires that the jury be drawn from "a fair cross-section of the community," without "excluding identifiable segments playing major roles in the community," and that by excluding any juror who was a member of the "Permanente program or Kaiser" the trial court "created a jury which was not composed of a fair cross-section of the community."

Aside from the question whether the constitutional rule of *Taylor*, requiring that members of a jury constitute a "fair cross-section of the community" and prohibiting racial or sexual discrimination in the selection of a jury in a criminal case, has any application to the exclusion of members of a group health plan or clinic in a civil case, no such constitutional objection was made at the time of trial in this case, at least in any clear and understandable manner.

The objections made by defendants at the time of trial were as follows:

"* * * We submit to the court there are two particular ones, [1] the concept of blanket exclusion of those members of a class without inquiry as to whether or not they had this prejudice, and number two, there has been no evidence to support counsel about the financial detriment to either the Permanente Clinic or Bess Kaiser Hospital."

In our view, this objection was insufficient to raise such a constitutional question. Also, we do not believe that this constitutional question is of sufficient importance so as to require this court to consider it when raised on appeal for the first time. The objection made on trial was, however, sufficient to raise the question whether jurors who were members of the "Permanente program or Kaiser" had such an "interest" as to make it proper for the trial judge to excuse them.

Plaintiff's complaint alleged:

"I.

"That at all times mentioned herein, Kaiser Foundation Hospitals was and is now a corporation organized and existing under and by virtue of the laws of the State of California and engaged in the operation and maintenance of certain hospitals and clinics in the State of Oregon, including Bess Kaiser Hospital in Portland, Oregon.

"II.

"That at all times herein mentioned, The Permanente Clinic was and is now a partnership of physicians and surgeons, duly licensed as such by the State of Oregon and employed by the Kaiser Foundation Health Plan of Oregon exclusively to provide medical and surgical care to their members."

Defendants contend on this appeal that members of the "Permanente program or Kaiser" were not biased by reason of that fact and cite decisions from courts of other states affirming trial courts in denying requests that members of group health plans or policyholders in insurance companies be excluded from juries for bias or interest.

In *Putnam v. Pacific Monthly Co.*, 68 Or 36, 51, 130 P 986, 136 P 835 (1913) (modified on other grounds in *White v. Milner Hotels, Inc.*, 267 Or 628, 518 P2d 631 (1974)), this court held that:

"* * * '[I]nterest on the part of a juror in the event of the action or the principal question involved therein' in good common sense as well as by our statute is a ground of challenge for implied bias: Section 122, subd. 4, L.O.L. This provision would certainly be available against a juror who was in fact a stockholder or interested in an insurance company warranting against loss by the injury forming the basis of pending litigations. * * *."

Whatever may be the rule with reference to a juror who is a policyholder of an insurance company which is not a party to the litigation, we are of the opinion that in view of our holding in *Putnam*, the limited scope of defendants' objections on trial, and defendants' apparent concession that trial courts have some

discretion in such matters, this trial court did not err in excluding from the jury members of the "Permanente program or Kaiser." Indeed, members of a group health plan, when called to serve on a jury in a case in which plaintiff seeks to recover a judgment of $1,500,000 against such a "plan," as in this case, might well believe that they have a financial interest in the outcome of such a case out of concern that their premiums or payments might be increased in the event of such a judgment.

Finding no error, the judgment of the trial court is affirmed.