Argued and submitted February 23, reversed and remanded August 8, reconsideration denied November 28, 1990, petition for review allowed January 3, 1991 (311 Or 60) See later issue Oregon Reports

Carroll Ann ZACHER,
*Respondent,*

*v.*

William M. PETTY,
and Gynecology Clinic, P.C.,
*Appellants,*

David M. COOK,
George Robie and
the State of Oregon by and through the
Oregon Health Sciences University,
*Defendants.*

(A8602-00863; CA A47637)

797 P2d 1042

Mildred J. Carmack, Portland, argued the cause for appellants. With her on the briefs were James G. Huegli and Schwabe, Williamson & Wyatt, Portland.

Kathryn H. Clarke, Portland, argued the cause and filed the brief for respondent.

Before Joseph, Chief Judge, and Riggs and Edmonds, Judges.

JOSEPH, C. J.

## JOSEPH, C. J.

In this medical malpractice action, defendants Dr. Petty and Gynecology Clinic, P.C., appeal from a judgment on a jury verdict awarding damages to plaintiff for injuries that she allegedly suffered as a result of surgery performed by Petty.[1] The record in this case is lengthy; we need only summarize the facts and the evidence relevant to the issues on appeal.

The surgery in question was performed on November 30, 1981, when the plaintiff was 31 years old. When she was 11 years old, she began to menstruate, and she experienced frequent menstrual cramping. About 1968, when she was 18 years old, she began to have excessive hair growth on her face. At that time, she also began to suffer from abdominal pain and was diagnosed as having a spastic colon. In 1973, she consulted a gynecologist regarding her menstrual irregularity and abdominal pain. In 1975, she was referred to the Oregon Health Sciences University (OHSU). From 1975 through 1980, she took birth control pills, which, in high dosages, ameliorated her pain symptoms; however, she had bad side effects and discontinued taking the pills. In 1977, physicians at OHSU performed a laparoscopy[2] to investigate the causes of her hormonal imbalance and pelvic pain. The laparoscopy revealed no evidence of endometriosis,[3] which could have caused her pain, but it did disclose polycystic ovarian disease (PCOD), which causes excessive hair growth.[4] No adhesions or fibrosis, which could also be causes of persistent pelvic pain, were found.

Plaintiff continued to have pelvic and abdominal

---

[1] The case originally was brought against Petty, his corporate clinic, Dr. George Robie, Dr. David Cook and the State of Oregon. The jury absolved Robie of any liability for plaintiff's damages. After filing a notice of appeal, Cook and the state dismissed that appeal. Petty and his corporation are the only appellants and will be referred to as "defendant" in this opinion.

[2] A laparoscopy is an operation that allows a visualization and examination of the abdominal cavity by the insertion of an instrument through a small incision just below the navel.

[3] Endometriosis is a scarring of the reproductive and abdominal organs associated with abnormal periodic shedding of the lining of the uterus.

[4] Polycystic ovarian disease, also known as Stein-Levanthal Syndrome or sclerocystic ovaries, results from abnormal stimulation of ovaries or the adrenal gland by hormones created by the pituitary gland. The disease commonly causes excess facial hair, also called hirsutism, male-pattern balding and male-pattern weight gain.

pain and problems symptomatic of PCOD. In early 1981, the pain disappeared for several months. Between May and November of that year, she had pain intermittently, but daily and in varying degrees. She was able to perform her teaching job and normal daily activities. In the fall of 1981, she saw Cook, an endocrinologist at OHSU, who referred her to defendant, a gynecologic surgeon, indicating to defendant his belief that removal of plaintiff's uterus, fallopian tubes and ovaries might help her hormonal imbalance.

Plaintiff saw defendant on November 10, 1981. He took her history and examined her; he also spoke to Cook, but did not obtain or review her medical records. The history and the physical examination noted three problems: pelvic pain, chronic constipation and PCOD, with increasing hirsutism. Defendant recommended a laparotomy—exploratory abdominal surgery—and obtained plaintiff's consent to remove any organs if he found sufficient pathology. He knew, from the time of the initial examination, that he probably would perform a total hysterectomy and a bilateral salpingo-oophorectomy (TAH/BSO),[5] because, given her symptoms, he did not believe that there were any viable alternatives to radical surgery. Plaintiff agreed to exploratory surgery, but asked defendant to leave her ovaries if they were normal. In her hospital records, defendant noted hormonal problems as part of the pre-operative diagnosis and as one basis for the surgery. Defendant also suspected that endometriosis was the cause of the pain. Additionally, his records made after surgery state that plaintiff had a TAH/BSO for PCOD.

During the laparotomy, defendant performed a TAH/BSO and also removed plaintiff's appendix. He concluded that the abdominal fibrosis and scarring that he observed had probably been caused by a past episode of pelvic inflammatory disease, probably of venereal origin. The pathology report demonstrated that the reproductive organs were normal, with the exception of mild to moderate fibrous adhesions on the outer surface of the fallopian tubes and mild fibrous cysts in one ovary; also, the appendix was chronically inflamed.

Pain recurred about two months after the surgery

---

[5] A TAH/BSO involves removal of the uterus, the ovaries and the fallopian tubes.

and, by 1983, it was occurring more frequently than before the surgery. The hirsutism also worsened. Plaintiff conferred with a reproductive endocrinologist, Dr. Vaitukaitis, who testified at trial that hormonal imbalance was a major factor contributing to plaintiff's pain. In her opinion, defendant's radical surgery was below the standard of care. Another of plaintiff's expert witnesses, Dr. Cotterell, testified that such radical surgery should not be undertaken for pain of an unknown cause, unless there is sufficient pathology to justify such a measure, which in this case, he said, there was not.

Defendant testified that TAH/BSO is not appropriate for PCOD. He said that he operated only to relieve her chronic pain. He submitted evidence that a TAH/BSO is an appropriate surgical treatment for chronic intractable pelvic pain, which may be caused by scarring and adhesions in the pelvic area. At trial, he described her pain as "incapacitating," a description he had not used in his initial examination report. He also described her scarring as "severe," the fallopian tubes as "fixed" to other pelvic structures and the pelvic anatomy as "distorted"; however, those findings are not included in his report generated during the surgery. Before the surgery, he had discussed with plaintiff the possibility of doing a wedge resection, a procedure used only for relieving PCOD symptoms. He denied that plaintiff had instructed him to leave her ovaries if they were normal but admitted that her ovaries showed no pathology.

Plaintiff's contention throughout the trial was that the surgery was medically unnecessary and inappropriate. She contends that she had PCOD, which caused the pain, that there were medical alternatives to surgery for treatment of PCOD and that, if surgery had been indicated, the appropriate operation would have been only a laparoscopy. She contends that Cook had recommended the TAH/BSO to defendant to correct the hormonal problems that accompanied the PCOD and that defendant performed it for that purpose.

Defendant's first three assignments of error concern the trial court's rulings on his objections to the filing of the Sixth Amended Complaint and testimony given by two of plaintiff's expert witnesses. Assignments 4 through 8 concern five allegations of negligence submitted to the jury, which

defendant contends were not supported by any evidence.[6] We address the latter assignments first.

Defendant claims that

"the rule in Oregon has always been that when any one of several allegations of negligence which have been submitted to the jury is not supported by evidence, and the defendant has called that fact to the court's attention by an appropriate motion, a general verdict cannot stand unless the court can somehow affirmatively determine that the erroneous submission of the unsupported theory was not prejudicial."

Defendant argues that, if any of the allegations submitted to the jury were not supported by evidence, he is entitled to a new trial.[7] This appeal was argued before the Supreme Court decided *Whinston v. Kaiser Foundation Hospital, supra,* n 7, which held that, "if the court cannot determine whether the verdict was based on an allegation supported by the evidence or on one unsupported by the evidence, the result is a new trial." 309 Or at 359. Defendant's position is substantially consistent with that holding.

Because the jury found for plaintiff, we give her the benefit of all evidence in her favor and all inferences that may

---

[6] The seven allegations of negligence submitted to the jury are:

"1. *In recommending a TAH/BSO to correct or control hormonal balance.*

"2. *In performing a TAH/BSO to correct or control hormonal imbalance.*

"3. *In performing a laparotomy when defendant Petty knew or should have known that a laparoscopy was a more appropriate surgical procedure.*

"4. In performing a TAH/BSO when defendant knew or should have known that removal of both ovaries, both fallopian tubes and plaintiff's uterus was not appropriate.

"5. In removing one or both ovaries when defendant knew or should have known that plaintiff wanted her ovaries retained if they appeared normal.

"6. *In failing to obtain or review plaintiff's medical records before recommending and performing a TAH/BSO.*

"7. *In failing to advise and warn plaintiff of the material risks, possible consequences and complications involved in proceeding with surgery, and alternatives to such surgical treatment when defendant knew or reasonably should have known of such risks, consequences and complications of the surgical treatment and the alternatives thereto.*"

The five allegations that defendant challenges are emphasized.

[7] Defendant properly preserved the assignments of error by motions to strike individual allegations of negligence from both the Fifth Amended Complaint and the Sixth Amended Complaint. *See Whinston v. Kaiser Foundation Hospital,* 309 Or 350, 359, 788 P2d 428 (1990).

be reasonably drawn from the evidence. *Wagner v. Kaiser Foundation Hospitals*, 285 Or 81, 83, 589 P2d 1106 (1979). Allegations of negligence must go to the jury if every element required to be proved is supported by any competent evidence. *Wagner v. Kaiser Foundation Hospitals, supra.* In medical malpractice cases, the plaintiff must establish: (1) the degree of care, skill and diligence used by ordinarily careful physicians in the same or a similar community in their specialty and in the same or similar circumstances; (2) that the defendant failed to use reasonable care and diligence in the application of that skill; and (3) that, as a result of the failure to exercise reasonable care, the plaintiff sustained injuries that would not otherwise have been sustained. *See* ORS 677.095.

■  Defendant argues that plaintiff did not produce evidence that failure to review the records was a cause in fact of any harm to her. To support allegation number 6, *see* note 6, *supra,* he contends, plaintiff would have had to produce evidence showing that, in the records, defendant would have found specific information that he had not otherwise obtained and, through expert testimony, prove that that information would or should have influenced his decision to recommend surgery.

Plaintiff's expert, Cotterell, testified that failure to review plaintiff's medical records from OHSU before performing surgery breached the standard of care. He also testified that the TAH/BSO was inappropriate, in view of plaintiff's medical history, defendant's recorded observations during surgery and the pathology report on the removed organs. Another expert, Dr. Parker, also said that it was below the standard of care not to look at the patient's medical records. The medical records were in evidence and contained a medical diagnosis that plaintiff was a virgin. They also contained the findings from the 1977 laparoscopy. Defendant testified that he suspected endometriosis as the source of plaintiff's pain but that he did not know that the 1977 laparoscopy had shown no evidence of endometriosis. He also said that he thought that plaintiff had most likely suffered a venereal infection, not knowing that she had not been sexually active. Dr. Goetsch, one of defendant's experts, testified that whether a patient is sexually active should be taken into consideration by the surgeon in this kind of case.

From the evidence, the jury could conclude that defendant had a duty to review the medical records and was negligent in failing to do so. The jury could also find that, because he had failed to review the records, he did not know that plaintiff was a virgin or that a previous surgical procedure had found no endometriosis. It could also conclude that not knowing those facts was a substantial factor in defendant's deciding to perform the TAH/BSO. *See Brennen v. City of Eugene,* 285 Or 401, 413, 591 P2d 719 (1979).

Defendant's argument is similar to the argument made in *Wagner v. Kaiser Foundation Hospitals, supra.* In that case, the plaintiff had alleged that the defendants had unreasonably failed to monitor his respiration, which resulted in brain damage. The defendants argued that that allegation should have been stricken, because the evidence consisted only of negative evidence of failure to chart and testimony that the medications given could cause depressed respiration. They claimed that, because there was no evidence that the plaintiff's breathing actually was slowed or that the defendants did not adequately monitor his breathing, the allegation was improperly submitted to the jury. The court rejected that argument and held that the correct evidentiary standard is "whether affirmative indirect or circumstantial evidence was offered so as to provide a basis from which the jury could properly draw an inference." 285 Or at 89. Here, defendant argues that the challenged allegation could only be supported by expert testimony stating that a specific piece of information contained in the medical records would have caused him not to recommend surgery or perform the TAH/BSO. That is wrong. Proof of causation in a medical malpractice case may be circumstantial. *Mayor v. Dowsett,* 240 Or 196, 211, 400 P2d 234 (1965). Medical experts testified that, with the information contained in plaintiff's records, defendant should not have recommended a laparotomy and, given his observations made during surgery, he should not have performed a TAH/BSO. The jury could properly have drawn the inference that, had he known that no endometriosis had been found four years earlier, he would not have recommended a laparotomy or that, if he had known that she was a virgin, he would not have

performed the TAH/BSO.[8] There was evidence sufficient to support the allegation of negligence.

■     In challenging allegations 1 and 2, *see* note 6, *supra*, defendant argues that there was no evidence that he recommended or performed a total hysterectomy for the primary purpose of correcting or controlling plaintiff's hormonal imbalance. His position is that the primary reason for the surgery was relief of the pain. He contends that there was no evidence that it would have been negligent for him to consider the hormonal problems in addition to the pain when recommending and performing surgery. He claims that, because no one testified that he would have performed a TAH/BSO had there not been pelvic pain, the allegations were unsupported by any evidence.

Plaintiff argues that neither of the allegations asserts that defendant was negligent in recommending and performing the surgery "solely" or even "primarily" for correction and control of hormonal imbalance. Her contention is that hormonal imbalance should not have played any part in the surgical decision, alone or in combination with other reasons, and that she submitted evidence that it was done for that reason, which was conduct below the standard of care.

Defendant's reason for performing the TAH/BSO was a question of fact for the jury to determine. He testified that it was only done for plaintiff's pelvic pain. He claims that her pain and her hormonal imbalance were two different conditions and that he operated and performed a total hysterectomy to resolve her pain. Plaintiff's medical records, however, contained evidence to the contrary. The history and physical examination record made by defendant before surgery indicated that her problems were pelvic pain, constipation and PCOD with increasing hirsutism. The records also indicated that Cook thought that removal of her fallopian tubes and ovaries would be useful to control the hirsutism. The records also contain defendant's own impressions of plaintiff's problems as possibly secondary to PCOD, that endometriosis was

---

[8] Defendant argues that there was evidence that inflammatory pelvic disease can result from other than sexually transmitted sources. His argument is, in effect, that, because of the contrary evidence, the jury could not have found that he would have made a different decision. However, the jury was not required to believe that evidence and could have concluded to the contrary on the basis of other evidence.

the etiology of her chronic pelvic pain, that an exploratory laparotomy was necessary and that a TAH/BSO was the probable surgical treatment.

On plaintiff's admission to the hospital, defendant recorded his admission diagnosis as chronic pelvic pain and increasing hirsutism. The post-surgery pathology report indicated that defendant's pre-operative diagnosis was hirsutism and a possible androgenizing ovarian tumor. Additionally, Cook, who consulted with defendant before surgery, later recorded that plaintiff had had a TAH/BSO for PCOD. In addition, two medical experts gave their opinions, on the basis of those records, that the surgery was performed to correct plaintiff's hormonal imbalance. With that evidence, the jury could have disbelieved defendant and could have concluded that he removed her reproductive organs to control her hormonal imbalance. If it had concluded that, the jury could have then concluded that he had breached the standard of care.

■ Defendant objects to allegation 3, *see* note 6, *supra,* for two reasons. First, he claims that the only evidence supporting the allegation is testimony by Vaitukaitis,[9] which he characterizes as only a *personal* opinion, because she was not asked whether the failure to perform a laparoscopy was below the applicable standard of care. Plaintiff contends that, taken in context, it is clear that the witness was expressing her

---

[9] This is the relevant part of her testimony:

"Q. Dr. Vaitukaitis, do you have an opinion as to whether or not Dr. Petty breached the standard of care in performing a total abdominal hysterectomy and bilateral salpingo-oophorectomy in [sic] Carroll Zacher?

"A. Yes.

"Q. And what is your opinion?

"A. My opinion is that based on the operative description of Dr. Petty there was no significant pathology described, gross pathology, prior to his undertaking the — undertaking the hysterectomy and bilateral salpingo-oophorectomy.

"Q. And what diagnostic tests in your opinion should have been undertaken?

"A. In my opinion Dr. Petty should have initially undertaken a laparoscopy to try to ascertain whether there was any significant intra-abdominal pathology or pelvic pathology.

"Q. And if he had done so, what information do you believe that a laparoscopy would have revealed?

"A. For practice [sic] purposes the same findings as in 1977, at the time of laparoscopy, except that the sclerocystic ovaries would not have been apparent, because with the prolonged oral contraceptive therapy the ovarian capsule was not markedly thickened."

*expert* opinion that defendant should have undertaken only a laparoscopy, because the standard of care permitted only that, just as he should not have performed a TAH/BSO, because doing that violated the standard of care. She argues that the testimony is legally sufficient, because an expert's testimony need not be in a particular form to express the applicable standard of care. *See Malila v. Meacham,* 187 Or 330, 336-38, 211 P2d 747 (1949); *W.R. Chamberlain & Co. v. Northwestern Agencies,* 42 Or App 125, 129, 600 P2d 438 (1979), *aff'd* 289 Or 201, 205-06, 611 P2d 652 (1980). We agree with plaintiff.

Defendant also argues that there was a lack of proof that his failure to perform a laparoscopy affected the course of plaintiff's treatment.[10] Specifically, he asserts that there was no evidence to support a finding that, if he had performed a laparoscopy, he would have decided not to do the laparotomy. He urges that, because there was evidence that he was aware of the major findings from her 1977 laparoscopy, he would have had no medical reason to do another in 1981. Plaintiff points to Vaitukaitis' testimony that, if a laparoscopy had been done in 1981, defendant would have found less pathology than was found during the 1977 laparoscopy. On the basis of that evidence, she argues, the jury could have inferred that, had he used only the diagnostic procedure, he would not have recommended radical surgery or, knowing the results of the second laparoscopy, plaintiff would not have consented to it.

The allegation is troublesome, in part because of its late appearance in the pleadings during the trial and in part because it is premised on plaintiff's other allegation that defendant was negligent in performing a TAH/BSO. Nonetheless, on review of a denial of a motion to strike the allegation, we conclude that there was some evidence to support it, and the trial court did not commit reversible error in permitting it to go to the jury.

■ Defendant argues that plaintiff failed to prove allegation 7, *see* note 6, *supra,* that he did not satisfy the physician's duty to obtain informed consent to surgery. He contends that plaintiff's uncontroverted testimony stated that

---

[10] Defendant concedes that he did not raise this argument in his motion to strike the allegation at trial. However, his objection was to the sufficiency of the evidence in support of the entire claim; so we will address this argument. *But see* ORAP 5.45(2); *Leiser v. Sparkman,* 281 Or 119, 122, 573 P2d 1247 (1978).

he advised her, to her satisfaction, about the possible risks and complications of, and the alternatives to, the surgery that she elected to undergo.

Plaintiff did not claim that the warnings and advice to her were inadequate and negligent apart from the duty to obtain her informed consent or that she asked defendant to discuss those matters in more detail and that he failed to do so. She argues that expert testimony was sufficient about various alternative treatments to prove what defendant should have done before radical surgery was undertaken. There was also evidence that it was below the applicable standard of care for defendant not to tell plaintiff about those alternative treatments.

ORS 677.097[11] provides what a physician must do to obtain informed consent. Subsection (1) lists the three explanations that must be given. Subsection (2) provides that, *if* the patient requests more explanation than the minimum required, then it is the physician's duty to provide the patient with a detailed explanation of the material risks and viable alternatives. *See Tiedmann v. Radiation Therapy Consultants,* 299 Or 238, 247-48, 701 P2d 440 (1985); *see also Getchell v. Mansfield,* 260 Or 174, 177-78, 489 P2d 953 (1971). Plaintiff's claim is essentially that defendant violated subsections (1)(b) and (c), or (2). However, her evidence does not support that claim. Plaintiff testified that defendant did discuss the alternatives of not doing surgery and of her going back on birth control pills. She also testified that she and defendant discussed various risks inherent in a total hysterectomy. She testified that she knew the consequences of a TAH/BSO and

---

[11] ORS 677.097 provides, in part:

"(1) In order to obtain the informed consent of a patient, a physician or podiatrist shall explain the following:

"(a) In general terms the procedure or treatment to be undertaken;

"(b) That there may be alternative procedures or methods of treatment, if any; and

"(c) That there are risks, if any, to the procedure or treatment.

"(2) After giving the explanation specified in subsection (1) of this section, the physician or podiatrist shall ask the patient if the patient wants a more detailed explanation. If the patient requests further explanation, the physician or podiatrist shall disclose in substantial detail the procedure, the viable alternatives and the material risks unless to do so would be materially detrimental to the patient."

that defendant discussed the various procedures that he could do during surgery, depending on what he found. There was no evidence that she requested more information, which, under ORS 677.097(2), would have obligated defendant to provide her with all of the material alternative treatments and risks.

■       Because we cannot tell whether the verdict was based on that unsupported allegation or conclude that submitting it to the jury did not prejudice defendant, the case must be remanded for a new trial. *Whinston v. Kaiser Foundation Hospital, supra,* 309 Or at 359.

Defendant's first assignment of error is that the trial court improperly overruled his objections to plaintiff's filing of the Sixth Amended Complaint, which, he argues, went beyond conforming to the evidence and contained new allegations of negligence. We do not need to address the assignment, because the pleadings are subject to reconsideration on remand, and any ruling we would make here would be merely advisory, at best.

■       Defendant's second and third assignments allege that the trial court erroneously admitted testimony by two experts who, he contends, only gave their personal opinions about why defendant performed the surgery.[12] He concedes that, under

---

[12] Vaitukaitis testified:

"Q  Do you have an opinion based upon a reasonable degree of medical probability for what purpose this surgery was done in 1981?
"* * * * *
"A  My opinion is that based on the note of Dr. Petty in which he specifically — Dr. Cook, rather, that specifically stated that the surgery was done for treatment of polycystic ovary syndrome based on the initial item, point three in the admission history of Dr. Petty, that this was following through with treating the patient for polycystic ovary syndrome."

Parker said:

"Q  Now, Dr. Parker, having reviewed the medical records, the depositions that you previously described, do you have an opinion regarding the basis upon which Carroll Zacher's surgery was done?
"* * * * *
"A  In reference to Dr. Petty * * *
"* * * * *
"So really there are several reasons that are documented in the chart why this patient had surgery, one was hirsutism and polycystic ovaries, two is her pain, three is the elevation of prolactin, four was exploratory surgery to exclude endometriosis. These are the reasons why this patient underwent that type of surgery."

OEC 704,[13] expert testimony may be admitted on an ultimate issue to be decided by the jury; however, he argues that the evidence exceeded the limits of OEC 704, because it only served to tell the jury who should prevail on a particular issue. *See DeRosa v. Kolb,* 90 Or App 548, 752 P2d 1282, *rev den* 306 Or 101 (1988); *French v. Barrett,* 84 Or App 52, 733 P2d 89 (1987); *Phomvongsa v. Phounsaveth,* 72 Or App 518, 696 P2d 567, *rev den* 299 Or 203 (1985). He also argues that the issue was not a proper subject for expert opinion, because other direct testimony by defendant and other witnesses stated that the surgery was for plaintiff's pain; therefore, the expert opinions merely told the jury not to believe defendant's evidence. *State v. Middleton,* 294 Or 427, 438, 657 P2d 1215 (1983).

Plaintiff claims that the experts' testimony was necessary to explain the medical records, which, she argues, were beyond the realm of everyday experience. She distinguishes this case from those cited by defendant, because they involved expert opinions directly concerning causation, which the testimony here did not do. Rather, she contends, both parties presented medical experts who reviewed and interpreted the records and then expressed their opinions as to the reasons for the surgery. Her experts' testimony did not comment on defendant's credibility, and neither expert directly expressed an opinion as to whether defendant was lying or telling the truth concerning why he performed the surgery.

Expert testimony is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue * * *." OEC 702. Whether or not defendant considered plaintiff's hormonal condition in deciding whether to do the surgery or to perform the TAH/BSO was a disputed fact issue for the jury to decide. After determining whether defendant considered PCOD, in whole or in part, when deciding to operate, the jury then had to determine whether that was negligent conduct and whether, if it was, it caused plaintiff injury.

Arguably, the jury itself would have been capable of reading the medical records and concluding whom to believe

---

[13] OEC 704 provides:

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

without expert testimony. However, the trial court concluded that the expert testimony would be helpful, which was in its discretion to do.[14]

The testimony also was not beyond the limits of OEC 704. There was no direct opinion, sought or given, about the credibility of defendant or his witnesses. *See State v. Padilla,* 74 Or App 676, 679, 704 P2d 524 (1985); *State v. Munro,* 68 Or App 63, 66, 680 P2d 708, *rev den* 297 Or 459 (1984). The experts' testimony was not merely opinions about the consequence of the disputed facts, and it did not usurp the jury's function to decide the questions of negligence and causation. *See DeRosa v. Kolb, supra,* 90 Or App at 551. Contrary to defendant's argument, the testimony did not tell the jury that defendant was lying or that plaintiff should prevail on the negligence issue. It was evidence on the factual question of whether PCOD entered into defendant's judgment process.

Reversed and remanded.

---

[14] "[T]here is no bright line separating issues within the comprehension of the jurors from those that are not." *State v. Middleton, supra,* 294 Or at 437.