Argued and submitted December 7, 2021, reversed in part and remanded January 5, 2023

PROVIDENCE HEALTH & SERVICES–OREGON,
an Oregon nonprofit corporation,
dba Providence Portland Medical Center,
*Plaintiff-Appellant,*

*v.*

Sanjana Pahalad MANCUSO,
Personal Representative of
the Estate of Rattan Kumar Pahalad,
in her official and personal capacities,
*Defendant,*

*and*

ELAP SERVICES, LLC,
a Delaware limited liability company,
*Defendant-Respondent.*

Multnomah County Circuit Court
16CV38474; A173949

524 P3d 973

Plaintiff appeals from a judgment denying plaintiff's claims after the trial court granted defendant's motion for summary judgment. Plaintiff assigns error to the trial court's rulings (1) that there was no evidence that defendant made the alleged misrepresentations that constituted plaintiff's Unlawful Trade Practices Act (UTPA) claim; (2) that a portion of the UTPA claim was preempted by ERISA; and (3) that the trial court lacked jurisdiction to adjudicate whether defendant acted wrongfully in violating the Oregon Rules of Professional Conduct for attorneys, as a basis for plaintiff's tortious interference with economic relations claim. Defendant argues the trial court did not err, and alternatively argues for affirmance on the basis that plaintiff was not a consumer and thus not a person who could bring a UTPA claim, and that plaintiff had not alleged any ascertainable loss as contemplated by the UTPA. *Held*: The trial court erred in granting defendant's motion for summary judgment. There was a genuine issue of material fact regarding whether defendant made the alleged misrepresentations that constituted the UTPA claim. The trial court's order was overly inclusive with respect to ERISA preemption. The trial court erred in concluding it did not have jurisdiction to adjudicate plaintiff's theory of tortious interference based on a violation of the Oregon Rules of Professional Conduct. Defendant's additional arguments do not provide an alternative basis for affirming the grant of summary judgment because a nonconsumer may bring an action under the UTPA and attorney fees incurred in litigation against a third party may qualify as an ascertainable loss for purposes of a UTPA claim.

Reversed in part and remanded.

Eric J. Bloch, Judge.

J. Aaron Landau argued the cause for appellant. Also on the opening brief was Harrang Long Gary Rudnick P. C. Also on the reply brief were Susan Marmaduke, Arden J. Olson, and Harrang Long Gary Rudnick P. C.

Kristopher R. Alderman argued the cause for respondent. Also on the brief were Mary-Anne Rayburn, Robert W. Kirsher, and Gordon & Polscer, L.L.C. and Thomas E. Lavender, III, and FisherBroyles, LLP.

Before Ortega, Presiding Judge, and Shorr, Judge, and Powers, Judge.

SHORR, J.

Reversed in part and remanded.

**SHORR, J.**

Plaintiff appeals from a judgment denying plaintiff's claims after the trial court granted defendant's motion for summary judgment. Plaintiff assigns error to the court's grant of summary judgment in favor of defendant on plaintiff's claims for violation of the Oregon Unlawful Trade Practices Act and tortious interference with economic relations. For the reasons set out below, we reverse in part and remand for further proceedings.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

In 2016, Rattan Kumar Pahalad sought care at the hospital Providence Portland Medical Center. Plaintiff Providence Health & Services-Oregon operates that hospital. Upon admission, Pahalad signed a Conditions of Admission form (the Agreement), agreeing to be financially responsible for payment for services provided by the hospital at its Charge Master rates.[1] Pahalad passed away after spending 12 days in plaintiff's hospital and undergoing quadruple bypass surgery. Plaintiff ultimately billed a total of $740,263.46 for the services provided.

Prior to his death, Pahalad was covered by an employer-funded health care plan (the Plan). The Plan was administered by defendant ELAP Services,[2] which functioned as the "Designated Decision Maker." Defendant's business model consists of auditing patients' medical bills by reviewing publicly available data from health service providers' financial filings with the government and then setting reimbursement rates based on defendant's assessment of the bills. Defendant will provide patients with legal representation to defend against medical providers' attempts to recoup any unpaid balance. Based on defendant's assessment, the Plan paid plaintiff $304,761.29 for the billed services, leaving $435,502.17 unpaid.

---

[1] A hospital's "Charge Master" is a comprehensive listing of billable items and the rates for those items.

[2] Though the litigation below included Pahalad's estate's personal representative as a defendant, the dispute before us concerns only defendant ELAP Services. Therefore, use of "defendant" in this opinion will refer only to ELAP Services.

Sanjana Pahalad Mancuso, Pahalad's daughter, was appointed the personal representative of Pahalad's estate. Plaintiff notified Mancuso of the unpaid balance under the Agreement and filed a claim against the estate. Mancuso conferred with her probate attorney and contacted defendant. Following its business model, defendant connected Mancuso with the law firm FisherBroyles to defend against plaintiff's claim on the estate. Mancuso signed an Attorney-Client Representation Agreement with the firm on September 7, 2016.[3] Mancuso subsequently filed a "Notice of Disallowance" on behalf of the estate on October 21, 2016, denying plaintiff's claim and stating in part:

> "[Plaintiff] has already been paid fully and properly for the goods and services it provided to the decedent between March 23, 2016, and April 4, 2016. Through your claim, you seek to collect excessive, unreasonable charges that neither the decedent nor the estate ever agreed to pay. As you admitted, [plaintiff] has already been paid $304,761.29 for these goods and services. Medicare would have paid and [plaintiff] would have accepted just $184,179.25 for the same goods and services. Thus, [plaintiff] has already been paid 165% of the amount routinely paid and accepted for these services. In 2015, [plaintiff] collected only about half of its total charges. Accordingly, to [plaintiff's] self-reported cost-to-charge ratios, the charges it seeks to collect from the estate are nearly three times its fully allocated costs to provide the goods and services to the decedent. [Plaintiff's] charges are grossly in excess of both the amounts typically paid for such goods and services and the costs incurred to provide them. The estate is not liable to pay such excessive, unreasonable charges. [Plaintiff] has already been paid properly for the goods and services provided to the decedent."

Plaintiff subsequently filed suit against Mancuso, claiming she breached a contract and her fiduciary duties as the representative of the estate by both failing to pay the outstanding hospital bill and denying plaintiff's resulting

---

[3] The Attorney-Client Representation Agreement stated that if she chose to pursue an appeal of the payment determination under the Plan, the law firm did not represent her in that matter. She filed a *pro se* appeal of the payment determination on October 19, 2016.

claim against the estate.[4] Plaintiff also named defendant in the litigation, alleging that defendant provided Mancuso with false information that led Mancuso to wrongly deny plaintiff's claim against the estate.

The trial court bifurcated the proceedings. Mancuso was ultimately found liable for breach of contract, and a jury awarded plaintiff $170,684.88 of the $435,502.17 it had sought from the estate.[5] Defendant moved for summary judgment on the claims against it for unlawful trade practices and tortious interference with economic relations. The trial court granted defendant's motion for summary judgment, ruling that there was no evidence that defendant made the alleged misrepresentations to Mancuso; a portion of the claim was preempted by federal law; and that the trial court lacked jurisdiction to adjudicate the wrongfulness of defendant's actions that were the basis for the tortious interference claim. Plaintiff appeals those rulings and the grant of summary judgment.

## II.   ANALYSIS

### A.   *Unlawful Trade Practices Act*

Plaintiff's first claim against defendant alleged that defendant engaged in unlawful trade practices. Before turning to the specifics of that claim, we provide some background regarding Oregon's Unlawful Trade Practices Act (UTPA). As we recently discussed in *Bohr v. Tillamook County Creamery Assn.*, 321 Or App 213, 228, 516 P3d 284 (2022), Oregon's UTPA was enacted as a comprehensive statute for the protection of consumers from unlawful trade practices. It contains an extensive list of practices declared unlawful. As relevant to the current matter, ORS 646.608(1)(h) states that it is an unlawful practice if in the course of a person's business, vocation, or occupation the person "disparages the real estate, goods, services, property or business of a customer or another by false or misleading representations of fact." The UTPA further provides that "a person that suffers an ascertainable loss of money or property, real or personal,

_____

[4] Plaintiff amended its complaint a number of times. The Third Amended Complaint is the subject of the current proceedings.

[5] Plaintiff withdrew the breach of fiduciary duty claim.

as a result of another person's willful use or employment of a method, act or practice declared unlawful under ORS 646.608" may bring suit to recover actual or statutory damages. ORS 646.638.

In its Third Amended Complaint, plaintiff claimed defendant employed unlawful trade practices when it made false and misleading representations of fact to Mancuso regarding plaintiff's charges for services, inducing her to wrongly deny payment under the Agreement. Specifically, plaintiff claimed that defendant made the following false statements to Mancuso:

"(a)  That [plaintiff] had already been paid fully and properly for the goods and services that it provided to Pahalad between March 23, 2016, and April 4, 2016;

"(b)  That [plaintiff] through its claim under the Agreement was seeking to collect excessive and unreasonable charges;

"(c)  That historic Medicare cost to charge ratio data were relevant to what Pahalad had agreed to pay under the Agreement or to what [defendant] was obliged to pay Pahalad's estate under the Plan;

"(d)  That [plaintiff] had been paid by the Plan 165% of the amount routinely paid and accepted for such services; and

"(e)  That [plaintiff's] Charge Master rates are grossly in excess of the amounts typically paid for such goods and services and of the costs incurred to provide those goods and services."

In its motion for summary judgment, defendant argued that there was no evidence that it engaged in the conduct alleged, that plaintiff had not suffered any ascertainable loss to form a basis for a UTPA claim, that plaintiff could not bring a UTPA claim because it was not a consumer, and that portions of the claim were preempted by federal law.

The trial court granted defendant's motion for summary judgment on the UTPA claim. The court found portions of plaintiff's claim were preempted by ERISA, the federal law governing the administration of Pahalad's health insurance plan. Regarding the remainder of the UTPA claim that

was not preempted by ERISA, the trial court found that there was no evidence that defendant (or the attorneys of FisherBroyles on behalf of defendant) made the misrepresentations alleged by plaintiff. The court found that the only way to conclude that defendant made the misrepresentations to Mancuso was through improper inference stacking and speculation. The court therefore found that there was insufficient evidence in the record to create a jury question as to whether the alleged misrepresentations were made by defendant, and thus granted defendant's motion for summary judgment.

Plaintiff assigns error to the trial court's decision on both grounds. Defendant argues that the trial court did not err, and alternatively asks us to affirm based on arguments that it raised in its summary judgment motion below that the trial court did not rule on. We address each in turn.

1. *Genuine issue of material fact*

On appeal of a grant of summary judgment, we will affirm the trial court's judgment if we agree that there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law. ORCP 47 C; *Two Two v. Fujitec America, Inc.*, 355 Or 319, 324, 325 P3d 707 (2014). No issue of material fact exists if, viewing the evidence in the light most favorable to the nonmoving party, "no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." ORCP 47 C. "The nonmoving party *** has the burden of producing evidence on any issue raised in the motion as to which it would have the burden of persuasion at trial." *Hagler v. Coastal Farm Holdings, Inc.*, 354 Or 132, 140, 309 P3d 1073 (2013). Thus, here, to defeat defendant's motion for summary judgment, plaintiff was required to come forward with specific facts demonstrating a genuine issue for trial regarding whether defendant made the alleged false and misleading representations to Mancuso. We conclude plaintiff has met that burden.

Plaintiff presented evidence regarding defendant's business model, including that its evaluations of medical bills and the amounts it pays are based in part on data that healthcare providers supply to the government. Defendant

then supplies patients with legal representatives who will dispute the remainder of the bill as excessive. Plaintiff also submitted evidence that Mancuso had engaged defendant's attorneys, at defendant's expense, with the express agreement that plaintiff had already been paid fairly for the services rendered.[6] The Notice of Disallowance Mancuso filed contained statements strikingly similar to those included in defendant's promotional materials, language included in the Plan regarding calculation of benefits, and correspondence between defendant and plaintiff regarding the billing. For example, the Notice of Disallowance referred to Medicare rates, plaintiff's past collections rates, and cost-to-charge ratios; text from the Plan and defendant's promotional materials refer to cost ratios and Medicare and Medicaid allowed amounts. At her deposition, Mancuso was unable to recall where she obtained the information included in the Notice of Disallowance, and acknowledged she was not an expert in Medicare reimbursements. The Notice of Disallowance also contained language mirroring defendant's letter to plaintiff regarding the balance bill, referring to the charges as "grossly excessive" or "grossly in excess" of actual costs. It would be reasonable for a factfinder to infer from that evidence that defendant, which regularly engages in audits of medical bills and review of publicly available data regarding reimbursement rates, made the representations to Mancuso for her to ultimately include in her Notice of Disallowance.[7]

       The trial court found that there was no evidence that defendant (or the attorneys of FisherBroyles on behalf

---

[6] The Attorney-Client Representation Agreement reads, in part:

"The Medical Provider may claim that the Client, ELAP, the Client's health benefit plan, and/or the third party administrator owe additional payment to the Medical Provider. It is the position of the Firm that the Medical Provider has been paid fair and reasonable reimbursement for the medical care and services rendered to Client upon the Medical Provider's receipt of the monies owed to it as described in the Explanation of Benefits for the medical care at issue. Although the Client has the option to appeal the payment determination made by Client's health benefits plan, the Firm does not intend to pursue such appeal on behalf of Client, and Client hereby acknowledges and agrees with that course of action by the Firm."

[7] We do not mean to suggest that the evidence *must* be interpreted this way, simply that it would be a reasonable inference for a factfinder to draw, thus creating a genuine issue of fact regarding a material element of the claim.

of defendant) made the statements at issue to Mancuso, reasoning that the only way to reach that conclusion was through inference stacking and speculation. However, affirmative indirect or circumstantial evidence can provide a basis from which a jury could properly draw an inference. *Wagner v. Kaiser Foundation Hospitals*, 285 Or 81, 89-90, 589 P2d 1106 (1979). Indeed, there are numerous situations where plaintiffs must rely on circumstantial evidence because the defendant is the only witness to an act. *Worman v. Columbia County*, 223 Or App 223, 233 n 6, 195 P3d 414 (2008). Reviewing the evidence in the light most favorable to plaintiff, and drawing all reasonable inferences in plaintiff's favor, we conclude that there was a genuine issue of material fact, and thus summary judgment was inappropriate.

Defendant argues that the uncontradicted testimony of defendant's corporate representative establishes that defendant did not have any substantial communication with Mancuso, did not provide the information to Mancuso, and had no knowledge of what the attorneys of FisherBroyles may have communicated to Mancuso. However, a factfinder is not required to believe the testimony of an interested party. *Worman*, 223 Or App at 232-33. To be sure, "[w]hen evaluating the evidence, uncontradicted testimony cannot be controverted on summary judgment simply by asserting that it should not be believed." *Hayes Oyster Co. v. DEQ*, 316 Or App 186, 193, 504 P3d 15 (2021), *rev den*, 369 Or 507 (2022). But "flat disbelief" of defendant's evidence does not create the genuine issue of material fact here; rather, plaintiff has set forth other facts that, when viewed in the light most favorable to plaintiff, establish a different version of what transpired.

Ultimately, "in determining whether to withdraw an allegation from consideration by the jury it is not the function of the court to weigh conflicting evidence. If an allegation is supported by any competent evidence, * * * it is the exclusive function of the jury to decide whether to believe that [evidence.]" *Wagner*, 285 Or at 84. Because the evidence submitted by plaintiff created a genuine issue of material fact regarding whether defendant made the alleged

misrepresentations to Mancuso, the trial court erred in granting defendant's motion for summary judgment.[8]

2.    *ERISA preemption*

The parties agree that the Plan that partially covered Pahalad's medical care was an employee benefit plan subject to the Employee Retirement Income Security Act of 1974 (commonly known as ERISA). ERISA includes a preemption clause, which supersedes state laws and claims insofar as they "relate to any employee benefit plan" governed by ERISA. 29 USC § 1144 (a).[9] Federal courts have explained that a claim "relates to" a plan governed by ERISA "if it has a connection with or reference to such a plan," looking at "whether the claim is premised on the existence of an ERISA plan, and whether the existence of the plan is essential to the claim's survival" and "the impact that the action has on a relationship governed by ERISA, such as the relationship between the plan and a participant." *Providence Health Plan v. McDowell*, 385 F3d 1168, 1172 (9th Cir 2004), *cert den*, 544 US 961 (2005). The trial court found that one of the bases for plaintiff's UTPA claim and the requested injunctive relief were preempted by ERISA. Whether a state claim is preempted by ERISA is a matter of law that we review for legal error. *Liberty Northwest Ins. Corp. v. Kemp*, 192 Or App 181, 186-87, 85 P3d 871, *rev den*, 337 Or 34 (2004).

As noted above, plaintiff's UTPA claim alleged that defendant made a number of misrepresentations of fact to Mancuso, including "(c) [t]hat historic Medicare cost to charge ratio data were relevant to what Pahalad had agreed to pay under the Agreement or to what [defendant] was obliged to pay Pahalad's estate under the Plan[.]" The

---

[8] As discussed above, defendant argues on appeal that we should affirm the trial court's summary judgment against plaintiff's UTPA claim because there was no evidence in the record from which a reasonable factfinder could infer that defendant made the alleged misrepresentations to Mancuso. We reject that argument. We note that defendant does not develop any argument on appeal that the claimed misrepresentations cannot, as a matter of law, amount to disparagement under ORS 646.608(1)(h). Further, outside of a passing mention in a one-sentence footnote, defendant also does not develop any argument that plaintiff failed to create a genuine issue of fact that the claimed misrepresentations were false. As a result, we do not reach those issues here.

[9] Some exemptions apply to the preemption clause, which are not applicable to this situation.

trial court found that all of the other alleged misrepresentations in plaintiff's UTPA claim required no interpretation of the Plan to determine falsity, but that alleged misrepresentation (c) was different, and required interpretation of the terms of the Plan to determine its falsity. Thus, the trial court found misrepresentation (c) was preempted by ERISA.

On appeal, the parties do not dispute that the second half of misrepresentation (c) requires an interpretation of the terms of the Plan. Whether historic Medicare cost to charge ratio data were relevant to what defendant was obliged to pay under the Plan clearly requires interpretation of the Plan, and thus was correctly found to be preempted by ERISA. Additionally, the parties agree that the first half of misrepresentation (c), concerning whether that same data was relevant to what Pahalad had agreed to pay under the Agreement with Plaintiff, was not preempted by ERISA, as it did not require any interpretation of the Plan. The parties merely disagree about what portion of misrepresentation (c) the trial court actually found to be preempted.

The trial court's Opinion and Order for summary judgment stated the following:

> "[A]lleged misrepresentation (c) appears to be different. It states: '[t]hat historic Medicare cost to charge ratio data were relevant to what Pahalad agreed to pay under the Agreement or to what [defendant] was obliged to pay Pahalad's estate under the Plan[.]' It is unclear how the falsity of such a statement could be properly determined without the court reviewing and interpreting the terms in the Plan. As such, allegation (c) sufficiently 'refers to' an ERISA plan and, as such, Plaintiff's UTPA claim, as it relates to the misrepresentation alleged in (c), is, indeed, 'conflict preempted.'"

Although the rationale of the court's opinion and order correctly found the alleged misrepresentations in the Third Amended Complaint to not be preempted insofar as they do not relate to the Plan, the above-quoted paragraph is overly inclusive of the entire scope of misrepresentation (c). Only the second half of misrepresentation (c) relates to the Plan, and thus, as the parties agree, only the second half of misrepresentation (c) is preempted by ERISA. On remand, the

trial court should modify its order to clarify that ERISA only preempts plaintiff's claim that defendant violated the UTPA when it allegedly misrepresented to Mancuso that historic Medicare cost to charge ratio data were relevant to what defendant was obliged to pay Pahalad's estate under the Plan. As with allegations (a), (b), (d), and (e), plaintiff's claim that defendant violated the UTPA by falsely misrepresenting that such data were relevant to what Pahalad had agreed to pay under the Agreement is not preempted by ERISA.

Additionally, in its prayer for relief in the Third Amended Complaint, plaintiff requested an injunction under ORS 646.638(1) barring defendant from taking any of the following actions in the future with respect to any patient of plaintiff or any of plaintiff's affiliates:

"(a)   Directly or through its administrator GPA, representing to [plaintiff] or its affiliates' patients that appeal rights under the patients' plans 'also apply to providers of services';

"(b)   Directly or through its administrator GPA, representing to [plaintiff] or its affiliates' patients that those providers' charges 'exceed the plan's allowable claim limits';

"(c)   Directly or through its administrator GPA, representing to patients or to their employers that patients are not liable for such charges because of [defendant's] contention that [plaintiff] or its affiliates' charges are 'excessive,' 'unreasonable,' 'arbitrary,' or words to that effect;

"(d)   Directly or through its administrator GPA, imposing arbitrary reductions in payments to or on behalf of [plaintiff's] or its affiliates' patients which are not actually supported by the terms of the plan and which have not been clearly made known to the patient before [plaintiff's] services are rendered; and

"(e)   Directly or through its administrator GPA, contending to patients or to employers that historic cost report data filed with the U.S. Centers for Medicare and Medicaid services serve as a basis for limiting any obligation to pay [plaintiff's] or its affiliates' Charge Master rates."

The trial court found that a determination of what, if any, of plaintiff's requested injunctive relief was appropriate

would require a determination of which of the representations plaintiff sought to have enjoined were actually false, which would necessitate the court interpreting the terms of an ERISA plan, which it was "conflict preempted" from undertaking under federal law. The court therefore granted defendant's motion for summary judgment to the extent plaintiff sought injunctive relief.

On appeal, plaintiff asserts that not all of the requested injunctive relief relates to an ERISA plan. We agree. The requested relief in paragraph (c) does not relate to and is not premised on the existence of any ERISA plan: A patient's financial liability for medical services received is not premised on or related to the administration of a plan subject to ERISA. Similarly, the requested relief in paragraph (e) could include a patient's contractual obligations to pay charges separate from such a plan. To the extent that the requested injunctive relief does not relate to an ERISA plan, it is not preempted.

We remand for the trial court to modify and narrow its ruling regarding what portions of the claim are preempted under ERISA.

3. *Plaintiff's ability to bring a UTPA action*

We turn now to defendant's alternative argument for affirmance, namely that plaintiff cannot avail itself of the UTPA because it is not a consumer of defendant's services. Though this was not a basis for the trial court's summary judgment ruling, it is purely a matter of law that we can and should resolve. *See Diens v. Bonome*, 314 Or App 364, 371, 499 P3d 846 (2021) ("[A]lternative bases for summary judgment that were raised but not decided below are generally well-suited to resolution on appeal, insofar as the propriety of summary judgment presents purely a question of law."). Defendant argues that the underlying purpose of the UTPA is to protect solely consumers from unlawful trade practices, and that a business cannot seek to avail itself of the UTPA's protections. Plaintiff argues that defendant's assertion is contrary to the plain text of the UTPA.

The parties' arguments require us to engage in statutory interpretation under our familiar methodology of

examining the statutory text, in context, along with any legislative history that is helpful to our analysis. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). ORS 646.638 states that "a person" that suffers an ascertainable loss as a result of unlawful trade practices may bring an individual action. The act defines "person" as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity except bodies or officers acting under statutory authority of this state or the United States." ORS 646.605(4). Plaintiff is a corporation, and therefore qualifies as a "person" under the plain text of the statute.[10] Thus, a corporation can be a person that suffers an ascertainable loss as a result of an unlawful trade practice and assert a UTPA claim under ORS 646.638, at least to the extent that the corporation is able to allege an individual UTPA violation.

Furthermore, our conclusion is consistent with the legislative history of the individual UTPA cause of action. When the UTPA was originally passed in 1971 as part of a collection of consumer protection measures, the individual action was available only to "any person who purchases or leases goods or services and thereby suffers any ascertainable loss" due to another's use of unlawful acts. Or Laws 1971, ch 744, § 13. Significantly, in 1975, the statute was amended to eliminate the requirement that the person must have purchased or leased goods or services. Or Laws 1975, ch 437, § 4. In a summary of the bill proposing the change, the Oregon Attorney General, who introduced the bill, described the amendment:

---

[10] We acknowledge that the federal District Court of Oregon has held otherwise. In *CollegeNET, Inc. v. Embark.com, Inc.*, 230 F Supp 2d 1167, 1173 (D Or 2001), that court noted that courts interpreting the UTPA had almost uniformly recognized that it first and foremost was a consumer protection statute. Based on that fact, the court held that the use of the word "person" in ORS 646.638 was ambiguous because "[i]t could reasonably be interpreted to include only those persons who have purchased or contracted for goods or services." *CollegeNET*, 230 F Supp 2d at 1173. Federal courts' interpretations of Oregon laws may be persuasive but are not controlling. *Wedgwood Homes v. Lund*, 294 Or 493, 502 n 11, 659 P2d 377 (1983). The rationale in *CollegeNET* is not convincing. Given the statutory definition of the word "person," we do not see how the term could be found to be ambiguous or held to mean anything other than what is explicitly stated in the Act.

> "Section 4 amends the private remedy under the [Unlawful] Trade Practices Act. Presently the only person who can recover damages is a consumer who suffers damages. The amendment would provide that any person who suffers damages could recover. The principal situation is where a competing businessman is injured as a result of an illegal practice by his competitor."

Appendix F, Senate Committee on Consumer and Business Affairs, SB 37, Jan 22, 1975 (letter of Oregon Attorney General Lee Johnson). Other than minor grammatical changes and the addition of exceptions that do not apply to the current matter, ORS 646.638(1) has not substantively changed since the 1975 amendment. The legislative history supports our understanding of the UTPA that a business that is not a consumer may bring an action if it can otherwise state a substantive UTPA violation.

While defendant is correct that past cases have noted the primary purpose of the UTPA is to protect consumers, our holding today is not contrary to that purpose. Consumers are protected through the prevention or remedying of false and misleading representations of fact being made in the course of business. *See Pearson v. Philip Morris, Inc.*, 358 Or 88, 116 n 17, 361 P3d 3 (2015) (noting the public enforcement option under the UTPA can be used to protect consumers from many of the unlawful practices that may not result in ascertainable losses, including ORS 646.608(1)(h)).

Plaintiff thus is not barred from bringing a UTPA action simply because it is a corporation and not a consumer in this situation.

### 4. *Ascertainable loss*

Defendant also argued in its summary judgment motion before the trial court, and raises again on appeal, the theory that the attorney fees plaintiff incurred in pursuing litigation do not qualify as an ascertainable loss as contemplated by the UTPA. As with the previous issue, the trial court did not rule on that argument, but the argument raised is purely a matter of law that we should resolve. *Diens*, 314 Or App at 371.

In the Third Amended Complaint, plaintiff alleged that defendant's misrepresentations to Mancuso interfered with satisfaction of the balance of the charges, causing an ascertainable loss to plaintiff due to the "costs, delay, expenses, and attorney fees of bringing this action." Defendant raises three arguments why those amounts are not recoverable. It asserts first that plaintiff cannot recover any of the unpaid bill because the litigation against Mancuso resolved the amount that plaintiff was legally owed; second, that attorney fees and litigation expenses are not the kind of ascertainable loss contemplated by the UTPA; and, third, that the UTPA provides for recovery of attorney fees for pursuing an action under the UTPA, so those fees would not be contemplated as a separate loss. Plaintiff responds by emphasizing that it was only seeking the fees and costs incurred in pursuing the litigation against Mancuso, which was necessary because defendant's unlawful trade practices induced Mancuso to breach the original Agreement.[11]

ORS 646.638 states that any person "that suffers an ascertainable loss of money or property, real or personal" as a result of another person's engagement in an unlawful trade practice may bring an individual action under the UTPA. "Ascertainable" loss has been interpreted to mean "capable of being discovered, observed or established." *Scott v. Western Int. Sales, Inc.*, 267 Or 512, 515, 517 P2d 661 (1973). The Oregon Supreme Court has further explained that:

> "[T]he loss must be objectively verifiable, much as economic damages in civil actions must be. But unlike general economic damages in a civil action, the loss required for a UTPA claim must be specifically of 'money or property, real or personal.' An ascertainable loss of some other kind—such as loss of physical ability due to a personal injury—is not cognizable in a UTPA claim. Likewise, noneconomic losses cognizable in a civil action—such as physical pain, emotional distress, or humiliation—will not satisfy a private UTPA plaintiff's burden."

*Pearson*, 358 Or at 117 (internal citations omitted).

---

[11] Though the complaint referred to the costs of bringing "this action," the action included both the claims against Mancuso for breach of the Agreement and those against defendant for violation of the UTPA and tortious interference with economic relations. The claims were bifurcated by the trial court.

We have held at times that attorney fees identified as losses in UTPA claims did not satisfy the "ascertainable loss" requirement. *See Hedrick v. Spear*, 138 Or App 53, 57-58, 907 P2d 1123 (1995) (party did not refer to any loss sustained as a result of the alleged unlawful trade practices; attorney fees were separately recoverable under the UTPA attorney fee provision if the party prevailed); *C.A.R. Tow, Inc. v. Corwin*, 76 Or App 192, 195-96, 708 P2d 644 (1985) (attorney fees incurred by a customer in defending a car repair shop's lawsuit for defamation and fraud did not stem from the alleged unlawful trade practices and were not an ascertainable loss within the meaning of the UTPA). Furthermore, the Oregon Supreme Court has held that the expenditure of money to prevent or mitigate possible future harm was "not the kind of loss compensable under the UTPA, because the expenditure [was] not based on any present harm to [the] plaintiff's economic interests." *Paul v. Providence Health System-Oregon*, 351 Or 587, 603, 273 P3d 106 (2012).

However, we conclude that the present claim is distinguishable. Plaintiff here has identified the ascertainable loss as those fees and expenses incurred in its litigation against Mancuso to recover the monies owed under the contractual agreement that defendant allegedly induced Mancuso to breach. That is an economic damage that is objectively verifiable. It was not merely an expenditure to prevent a future harm, as in *Paul*; rather, here, plaintiff was attempting to remedy the present harm of Mancuso's failure to pay the amount owed under the Agreement. Plaintiff's theory is that defendant's actions resulted in the need to pursue litigation against Mancuso, which caused plaintiff to suffer ascertainable losses in the form of attorney fees and other litigation expenses.[12] That is not an expenditure to prevent future harm. Furthermore, that is not a claim for attorney

---

[12] We acknowledge that the "American Rule" is that, as a general rule, each litigant pays their own attorney fees absent a right to recover attorney fees provided by a contract or statute. *See State v. Ramos*, 358 Or 581, 600-01, 368 P3d 446 (2016). However, there are some exceptions to the American Rule, including that expenses incurred in third-party litigation to remedy a party's harms are recoverable as "economic damages." As the Supreme Court recently held:

"'A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third

fees in pursuit of the UTPA action against defendant, which are otherwise recoverable under ORS 646.638(3).

Because we conclude as a matter of law that attorney fees incurred as a result of litigation against a third-party to remedy an alleged violation of the UTPA may qualify as an ascertainable loss, defendant has not presented an alternative basis upon which to affirm the trial court's grant of summary judgment.[13]

B.   *Tortious Interference with Economic Relations Claim*

Plaintiff's second claim against defendant alleged tortious interference with plaintiff's economic relations, based on defendant's interference with plaintiff's contract with Pahalad (and his estate upon his death). To prevail on a claim for tortious interference with economic relations, a plaintiff must prove

> "(1) the existence of a professional or business relationship (which could include, *e.g.*, a contract or a prospective economic advantage); (2) intentional interference with that relationship or advantage; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and the harm to the relationship or prospective advantage; and (6) damages."

*Allen v. Hall*, 328 Or 276, 281, 974 P2d 199 (1999). With respect to the fourth element, a plaintiff may demonstrate the means utilized "'violate some objective, identifiable standard, such as a statute or other regulation, or a recognized rule of common law, or, perhaps, an established standard of a trade or profession.'" *Ride PDX v. Tee & B, LLC*, 322 Or App 165, 168, 519 P3d 870 (2022) (quoting *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or 487, 498, 982 P2d 1117 (1999)).

---

person is entitled to recover compensation for the reasonably necessary loss of time, attorney fees and other expenditures thereby suffered or incurred.'"

*State v. Fox*, 370 Or 456, 466-67, 521 P3d 151 (2022) (quoting *Ramos*, 358 Or at 601).

[13] We express no opinion on whether defendant actually caused the loss or as to the amount of damages that would be due as those issues are not before us.

Plaintiff advanced two theories regarding improper means: (1) defendant engaged in improper means when it falsely disparaged plaintiff's business as set forth in the UTPA claim; and (2) defendant engaged in improper means when it induced Mancuso to accept legal representation from defendant's counsel under circumstances constituting a legal conflict of interest that is impermissible under the Oregon Rules of Professional Conduct (ORPC) for attorneys.

The trial court granted defendant's motion for summary judgment on the tortious interference claim. The trial court concluded that, for the same reasons it granted the summary judgment motion with respect to the UTPA claim, the record was "devoid of evidence sufficient to support a jury finding that [defendant] employed 'improper means' by the making of false representations to Mancuso[.]" The trial court further concluded that it was without authority to determine whether a violation of the ORPC had occurred, because enforcement and adjudication of the ORPC is reserved to the Oregon Supreme Court and the Disciplinary Board of the Oregon State Bar. Because it lacked the authority to determine whether a conflict of interest was proven, the trial court further determined that plaintiff could not establish "improper means," a necessary element of the tortious interference claim.

Plaintiff challenges both conclusions. For the reasons articulated above, we reverse with respect to the UTPA claim, as we have concluded that there was a genuine issue of material fact regarding whether defendant made the alleged misrepresentations to Mancuso. As we explain below, we further conclude that the trial court erred in determining that it did not have the authority to find "improper means" based on a violation of the ORPC.

We review for legal error the trial court's determination that defendant was entitled to judgment as a matter of law. *Bank of America, N. A. v. Carlson*, 298 Or App 505, 507, 447 P3d 507 (2019). Below, the trial court relied primarily on *VavRosky MacColl Olson v. Employment Dept.*, 212 Or App 174, 187, 157 P3d 312 (2007), in concluding that it did not have authority to decide the merits of the alleged violation of the ORPC. In that case, an employer law firm

terminated an attorney employee following his development of a medical condition that rendered him unable to perform his job tasks. *VavRosky MacColl Olson*, 212 Or App at 176-78. The employee was awarded unemployment benefits and the employer appealed, arguing that, even though the attorney retained his bar license, he was unable to comply with the rules of professional conduct, and therefore was unable to satisfy a job prerequisite required by law, making him ineligible for unemployment benefits. *Id.* at 178. We held that the Supreme Court and the Oregon State Bar had exclusive jurisdiction to enforce the rules of professional conduct. We explained that there would have to be an adjudication by one of those bodies suspending or revoking the attorney's license to entitle the employer to relief from unemployment charges on that basis. *Id.* at 187. In the present matter, the trial court concluded that the issue regarding the existence and effect of an ORPC violation was substantively and procedurally nearly identical to that in *VavRosky MacColl Olson*. In other words, the trial court concluded that, without an actual adjudication by the Oregon State Bar or the Oregon Supreme Court of a violation of the ORPC by defendant, the trial court could not determine if defendant had acted improperly by violating the conflict-of-interest rules.

We disagree. In *VavRosky MacColl Olson*, the actual adjudication of a violation of the ORPC was a predicate to the claimed relief. Here, an adjudication or finding of a violation of the ORPC was not a necessary predicate for the trial court to find defendant to have engaged in improper conduct. In *Kidney Association of Oregon v. Ferguson*, 315 Or 135, 843 P2d 442 (1992), the Oregon Supreme Court noted that trial courts, while lacking the authority to determine disciplinary rule violations, as such, or to impose a sanction for the violation thereof, did have the authority to consider, in determining appropriate attorney fees, whether an attorney had breached a fiduciary duty owed to a client, such as a violation of the conflict-of-interest rules. *Kidney Association*, 315 Or at 143-44. Further, we have noted that "outside the context of disciplinary proceedings—and particularly in breach of contract and malpractice actions—disciplinary rules may define the scope of duties, including fiduciary duties, that an attorney owes to a client." *Frost v. Lotspeich*,

175 Or App 163, 187-88, 30 P3d 1185 (2001). Because an official finding of a violation of the ORPC or some actual discipline of an attorney was not a predicate to a finding of "improper means," the trial court did not lack authority to proceed on plaintiff's theory in the tortious interference claim.[14]

      In sum, we conclude that the trial court erred when it granted defendant's motion for summary judgment. There was a genuine issue of material fact regarding whether defendant made the alleged misrepresentations that allegedly caused Mancuso to breach the Agreement, constituting a potential violation of the UTPA. The trial court's order was overly inclusive with respect to ERISA preemption and extended to matters that did not relate to the Plan. Defendant's additional arguments do not provide an alternative basis for affirming the trial court's grant of summary judgment, because we conclude a business may bring an action under the UTPA and attorney fees incurred in litigation against a third party to remedy harm caused by unfair trade practices may qualify as an ascertainable loss for purposes of a UTPA claim. The trial court also erred in concluding that it did not have jurisdiction to adjudicate plaintiff's theory of tortious interference based on a violation of the Oregon Rules of Professional Conduct.

      Reversed in part and remanded.

---

[14] As with the additional elements of the UTPA claim, we take no position on whether defendant's actions actually constituted improper means. We also decline to address defendant's additional arguments regarding other elements of the tortious interference claim, including causation and damages, as they involve questions of fact to be determined by a factfinder on remand.